Alex R. Straus (SBN: 321366)
Whitfield Bryson LLP
16748 McCormick Street
Los Angeles, CA 91436
Telephone:   (917) 471-1894
Facsimile:   (615) 921-6501
astraus@whitfieldbryson.com

[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUGO ELLIOTT, on behalf of himself and all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>PUBMATIC, INC.,<br><br>Defendant. | **CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

CLASS ACTION COMPLAINT
Jury Trial Demanded

Plaintiff Hugo Elliott, individually, and on behalf of all others similarly situated, brings this Class Complaint against Defendant PubMatic, Inc. ("PubMatic") and alleges the following:

**INTRODUCTION**

1. PubMatic is a digital advertising technology company that develops online software and strategies for the digital publishing and advertising industry aimed at reaching target audiences across advertising formats and devices through the use and dissemination of personal data.

2. The General Data Protection Regulation ("GDPR") of the European Union[1] requires businesses to protect the personal data and privacy of natural persons.

3. PubMatic creates and places unique identifiers in the form of cookie IDs on internet users' devices which allow it to read and share personal data from that user.

4. These cookie IDs and the data that they allow PubMatic to collect constitute personal data protected by the GDPR.

5. Pursuant to the GDPR, in order to legally perform the activities that PubMatic is performing, it must have either consent from the user or a legitimate interest in processing the user's personal data.

6. Any consent obtained from data subjects is inadequate because it is either non-existent or not compliant with the GDPR.

---

[1] As of January 1, 2021, the United Kingdom's withdrawal from the European Union was completed. Significantly, UK domestic law contains materially identical obligations to the GDPR as a consequence of the European Union (Withdrawal) Act 2018 and the Data Protection, Privacy and Electronic Communications (Amendments ETC) (EU Exit) Regulations 2019. A full comparison of the GDPR to what has been adopted in the UK is available at: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachment_data/file/946117/20201102_-_GDPR_-_MASTER_Keeling_Schedule_with_changes_highlighted_V3.pdf. Because the UK GDPR contains materially identical obligations to the EU GDPR, to avoid confusion the applicable laws will just be generally referred to as GDPR.

CLASS ACTION COMPLAINT
Jury Trial Demanded

7.     PubMatic cannot rely on its legitimate interest in processing personal data, as such reliance is precluded by law. However, even if it were not precluded as a matter of law, the balance of interests does not support PubMatic.

8.     As such, PubMatic lacks a lawful basis for processing personal data.

9.     PubMatic's processing of personal data without a lawful basis via the creation of cookie IDs and the collection of associated browser-generated information constitutes intrusive, extensive, and unexpected loss of control of the users' personal data in violation of the GDPR.

10.    PubMatic also lacks transparency due to the inadequate or non-existent communication with users, defined under the GDPR as data subjects, in violation of Articles 5(1)(a) and Articles 13-14 of the GDPR.

11.    Plaintiff Hugo Elliott is a victim of PubMatic's blatant disregard for the privacy rights set forth in the GDPR.

12.    Mr. Elliott files this action to recover the damages he, as well as thousands of other citizens of the United Kingdom, have incurred from PubMatic's wrongful conduct and to stop PubMatic's unlawful practices of gathering, processing, and disseminating users' personal data.

**PARTIES**

13.    Mr. Hugo Elliott is a citizen of London, United Kingdom.

14.    Mr. Elliott is a "data subject" as that term is defined in Article 4(1) of the GDPR.

15.    PubMatic was incorporated, and is existing, under the laws of the State of Delaware.

16.    PubMatic's principal place of business is in Redwood City, California.

17.    PubMatic was and is a "controller" as defined in Article 4(7) of the GDPR.

**JURISDICTION AND VENUE**

18.    This Court has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act. The amount in

3

CLASS ACTION COMPLAINT
Jury Trial Demanded

controversy exceeds $5,000,000, exclusive of attorneys' fees, pre-judgment interest, and costs, there are members of the proposed Class who are citizens or subjects of a foreign state, and PubMatic is a citizen of California.

19.     This Court also has subject matter jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and because complete diversity exists as PubMatic is a citizen of California while Mr. Elliott and the putative class members are domiciled in the United Kingdom.

20.     This Court may exercise personal jurisdiction over PubMatic because PubMatic conducts substantial business in this State and within the Northern District of California and receives substantial compensation and profits from the activities it undergoes in this District.

21.     Venue is proper in this District under 28 U.S.C. § 1391(a), as PubMatic resides in this District and under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

22.     California is the most convenient forum for this litigation, as PubMatic specifically submitted to the exclusive jurisdiction and waiver of any venue objections against the state and federal courts located in Santa Clara County, California or the Borough of Manhattan in New York in any dispute arising under or in connection with their Master Services Agreement.[2]

23.     The United Kingdom is not the proper jurisdiction because PubMatic has never purposefully subjected itself to personal jurisdiction in the United Kingdom.

## **INTRADISTRICT ASSIGNMENT**

24.     This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because PubMatic's principal place of business is in San Mateo County, which is served by the San Francisco Division. Moreover,

---

[2] See Section 11 "Choice of Law & Venue" at https://pubmatic.com/legal/publisher-master-services-agreement/#Choice.

CLASS ACTION COMPLAINT
Jury Trial Demanded

1   PubMatic conducts substantial business in San Mateo County, which is served by this

2   Division.

### LEGAL FRAMEWORK

### Request for Application of Foreign Law

25.     Mr. Elliott and the Class Members plead foreign law in accordance with
Federal Rule of Civil Procedure 44.1, which provides:

> A party who intends to raise an issue about a foreign country's law must
> give notice by a pleading or other writing. In determining foreign law,
> the court may consider any relevant material or source, including
> testimony, whether or not submitted by a party or admissible under the
> Federal Rules of Evidence. The court's determination must be treated
> as a ruling on a question of law.

26.     Attached hereto as Exhibit A is a full version of the General Data
Protection Regulation (EU) 2016/679 ("GDPR"), which now applies in England & Wales
following the United Kingdom's exit from the European Union on January 31, 2020
and the end of the transition period on December 31, 2020.

27.     GDPR is a regulation that lays out rules relating to the protection of
natural persons with regard to the processing of personal data, and rules relating to
the free movement of personal data.

28.     The GDPR was passed on April 14, 2016 and went into effect on May 25,
2018. It applies in England and Wales subject to certain derogations contained in the
Data Protection Act 2018 ("DPA 2018"). As of January 1, 2021 (when the United
Kingdom's withdrawal from the European Union was complete), UK domestic law
contains materially identical obligations to the GDPR as a consequence of the
European Union (Withdrawal) Act 2018 and the Data Protection, Privacy and
Electronic Communications (Amendments ETC) (EU Exit) Regulations 2019.

29.     The GDPR protects the fundamental rights and freedoms of natural
persons and, in particular, their right to the protection of their personal data.

30.     The GDPR applies to the automated or structured processing of personal
data, including processing in the course of an activity that falls outside the scope of EU

CLASS ACTION COMPLAINT
Jury Trial Demanded

law and processing in the course of an activity that falls within the scope of Chapter 2 of Title 5 of the Treaty on European Union. GDPR, Article 2.

31.     The GDPR applies to the processing of personal data in the context of the activities of an establishment of a controller or a processer in the United Kingdom, regardless of whether the processing takes place in the United Kingdom or not. GDPR, Article 3(1).

32.     The GDPR applies to the relevant processing of personal data of data subjects who are in the United Kingdom by a controller or processor not established in the United Kingdom, where the processing activities are related to the monitoring of data subjects' behavior as far as their behavior takes place within the United Kingdom. GDPR, Article 3(2)(b).

33.     The GDPR applies to the processing of personal data by a controller not established in the United Kingdom, but in a place where domestic law applies by virtue of public international law. GDPR, Article 3(3).

34.     "Personal data" is defined as any information relating to an identified or identifiable natural person ("data subject"). An identifiable natural person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, **an online identifier**, or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural, or social identity of that natural person. GDPR, Article 4(1) (emphasis added).

35.     Recital 30 of the GDPR provides, "Natural persons may be associated with online identifiers provided by their devices, applications, tools and protocols, such as internet protocol addresses, **cookie identifiers** or other identifiers such as radio frequency identification tags. This may leave traces which, in particular when combined with unique identifiers and other information received by the servers, may be used to create profiles of the natural persons and identify them." (Emphasis added.)

36.     Clearly, a cookie identifier falls within the definition of personal data.

CLASS ACTION COMPLAINT
Jury Trial Demanded

37.   "Controller" is defined as the natural or legal person, public authority, agency, or other body which, alone or jointly with others, determines the purposes and means of the processing of personal data. GDPR, Article 4(7).

38.   The GDPR imposes an obligation on a controller to demonstrate compliance. According to Article 5(2), "The controller shall be responsible for, and be able to demonstrate compliance with, paragraph 1 ("accountability")."

39.   Personal data shall be processed lawfully, fairly, and in a transparent manner in relation to the data subject. Article 5(1)(a) ("lawfulness, fairness, and transparency").

40.   Personal data shall also be collected for specified, explicit, and legitimate purposes and not further processed in a manner that is inconsistent with those purposes. Article 5(1)(b) ("purpose limitation").

41.   Personal data shall be processed in a manner that ensures appropriate security of the personal data, including protection against unauthorized or unlawful processing and against accidental loss, destruction or damage, using appropriate technical or organizational measures. Article 5(1)(f) ("integrity and confidentiality").

42.   Pursuant to the GDPR, processing personal data is only lawful in certain circumstances. Specifically related to the claims herein[3], processing personal data shall be lawful only if:

   a. The data subject has given consent to the processing of his or her personal data for one or more specific purposes; or

   b. The processing is necessary for the purposes of the legitimate interests pursued by the controller or by a third party, except where such interests are overridden by the interests or

---

[3] The GDPR provides other purposes which would make processing lawful. However, none of them are applicable to the facts of this case.

CLASS ACTION COMPLAINT
Jury Trial Demanded

fundamental rights and freedoms of the data subject which require protection of personal data.

43.   Consent of a data subject means any freely given, specific, informed and unambiguous indication of the data subject's wishes by which he or she, by a statement or by a clear affirmative action, signifies agreement to the processing of personal data relating to him or her. GDPR, Article 4(11).

44.   The GDPR places additional requirements on controllers, such as requiring the controller to provide certain information to the data subject. GDPR, Article 13-14.

45.   The GDPR provides a private right of action to a data subject who considers that his or her rights under the GDPR have been infringed as a result of the processing of his or her personal data in violation of the GDPR. GDPR, Article 79(1).

46.   Any person who has suffered material or non-material damage as a result of an infringement of the GDPR shall have the right to receive compensation from the controller or processor for the damage suffered. GDPR, Article 82(1).

47.   Any controller involved in processing shall be liable for the damage caused by processing which infringes the GDPR. GDPR, Article 82(2).

## COMMON FACTUAL ALLEGATIONS

### PubMatic's Actions

48.   PubMatic is a digital advertising technology business.

49.   PubMatic claims that it provides a specialized cloud infrastructure platform that enables real-time programmatic advertising transactions.

50.   PubMatic is a "controller," as defined in Article 4(7) of the GDPR.

51.   PubMatic is the legal person who determines the purposes and means of the processing of personal data.

CLASS ACTION COMPLAINT
Jury Trial Demanded

52.     PubMatic willingly admits to being the controller of the data subjects' personal data in its privacy policy.[4]

53.     PubMatic is a supply side platform. This essentially means that it assists websites ("publishers") with the management and sale of advertising space on the publishers' websites.

54.     According to PubMatic's website, PubMatic's platform empowers independent app developers and publishers to control and maximize their digital advertising businesses and enables advertisers to drive return on investment by reaching and engaging their target audiences.

55.     Supply side platforms are a cornerstone of the infrastructure that allows targeted online advertising.

56.     As part of its business practices, PubMatic placed identifiers in the form of cookies on Mr. Elliott's device and Class Members' devices (hereafter referred to as "setting cookies").

57.     Among these PubMatic cookies is one named "KAUSERCOOKIE." The KAUSERCOOKIE is a cookie with a cookie ID in the form of an alphanumeric string.

58.     Each KAUSERCOOKIE cookie ID is unique and, thus, uniquely identifies an individual user.[5]

59.     The purpose for which the cookie ID is created and subsequently used is not fully disclosed to the data subject in advance.

60.     In fact, data subjects do not interact directly with PubMatic, but instead only interact through publishers' websites.

---

[4] PubMatic, Inc., is the party responsible for the management of your personal information jointly used by it and its affiliates. For the purposes of EU data protection legislation, PubMatic, Inc is the controller of your personal information. https://pubmatic.com/legal/privacy-policy/.
[5] Hereafter, this Complaint will refer to the PubMatic KAUSERCOOKIE as "the PubMatic cookie" and the PubMatic KAUSERCOOKIE ID as "the cookie ID."

CLASS ACTION COMPLAINT
Jury Trial Demanded

61.     PubMatic uses these unique cookie IDs to record Mr. Elliott and Class Members' visits to websites and their browser-generated information ("BGI") on those websites.

62.     PubMatic admits in its Privacy Policy that:

a.  "We use and deploy tracking technologies to automatically collect certain information about the End Users and their devices. Some of this information (including, for example, unique identifiers stored in a cookie or mobile advertising IDs) may identify a particular computer or device and may be "personal data" in some jurisdictions, including the EU and the State of California."

b.  "We (and our partners or vendors) may collect this information the first time an End User interacts with a Publisher Client's Digital Property that uses our Ad Services, and we may combine and associate this information with information we (or our partners) may collect about the End User's interactions with other ads served through our Platform."

c.  "The information we collect includes:

i.   Browser and Device information, IP address, and identifiers assigned to a device, such as its iOS Identifier for Advertisers (IDFA), Android/Google Advertising ID (AAID or GAID), or other unique device identifier including identifiers stored in a cookie, ETag, or browser or web cache.

ii.  Information about an End User's behavior on our Publisher Clients' Digital Properties, such as activities or actions on those Digital Properties, session start/stop time, and geolocation.

iii. Information about ads served, viewed, or clicked on, such as the type of ad, where the ad was served, whether the End

10

CLASS ACTION COMPLAINT
Jury Trial Demanded

User clicked on it, the number of times an End User has seen the ad, and whether the End User visited the Media Buyer's website or relevant app store and/or purchased or installed the product or service advertised."

63. When the PubMatic cookie ID is set and the cookie information is read, information is sent to PubMatic's servers. As admitted in its privacy policy, such information sent includes the unique cookie ID, the website the user is visiting, the user's location data, including IP address, ads viewed and clicked, the "user-agent string," which is a list of information about the user's browser and operating system, and other user data.

64. The cookie ID and the data collected by PubMatic from Mr. Elliott and Class Members constitute personal data pursuant to Article 4(1) of the GDPR because it is information relating to an identified or identifiable natural person.

65. Specifically, the cookie ID functions as a unique identifier for data subjects, including Mr. Elliott and Class Members. Further, other data collected by PubMatic, such as BGI and individual's IP addresses, also constitutes personal data.

66. In creating the cookie ID, and thus personal data, PubMatic is processing Mr. Elliott and Class Members' personal data without a lawful basis.

67. PubMatic engages in "cookie syncing" where it exchanges cookie-based information with other companies as a user browses from website to website.

68. Cookie syncing is one of many advertising technology tools, referred to generally as "AdTech" in the industry, that helps agencies and brands target, deliver, and analyze digital advertising efforts.

69. Cookie syncing between AdTech businesses involves one AdTech business sending information about the cookie ID it has assigned to a user with at least one other AdTech business, and receiving the cookie IDs that those other Adtech businesses have assigned to the same user. This permits the participating AdTech

CLASS ACTION COMPLAINT
Jury Trial Demanded

businesses to communicate about that user away from the user's device despite using different cookie IDs to identify that user.

70.    Specifically, PubMatic engages in cookie syncing by storing third-party cookies that reference the cookie IDs set by other AdTech businesses with which it has synced.

71.    By engaging in cookie syncing, data subjects' unique cookie IDs, and potentially their BGI, are shared with any company with which PubMatic syncs cookies.

72.    Such cookie syncing is meant to maximize the chance that an advertiser can identify the user while minimizing the number of cookie syncing calls on the user's browser.

73.    PubMatic describes in its Cookie and Other Similar Technologies Policy: "We use this cookie to correlate our user IDs with those of our partners (such as demand side platform clients or other advertising technology companies). We pass the information stored by the partner in this cookie to the partner when it is considering whether to purchase advertisements. This enables the partner to make better decisions about whether to display an advertisement to you."

74.    By using the unique cookie IDs, the BGI, and cookie syncing, PubMatic is able to help publishers monetize their websites by auctioning advertising slots.

75.    PubMatic initiates a bidding process by sharing data subjects' personal data, including BGI attached to the unique cookie IDs, into the Real-time Bidding ("RTB") system.

76.    This sharing allows those other companies to target advertising to data subjects when visiting websites.

77.    The targeted advertising allows website advertisers to better spend their marketing dollars, allowing them to capitalize on their most targeted subjects while PubMatic unlawfully provides personal data of data subjects, including Mr. Elliott and Class Members.

CLASS ACTION COMPLAINT
Jury Trial Demanded

78.   PubMatic is believed to manage 134 billion ad impressions and 1 trillion advertiser bids daily.[6]

79.   The advertising slots are auctioned in the RTB system.

80.   PubMatic submits bid requests from publishers it works with into the RTB system, which includes ad exchanges and demand side platforms.

81.   Demand side platforms then submit bid responses to PubMatic's bid requests.

82.   PubMatic arranges for the highest bidders to place their advertising in the available ad slot.

83.   The Interactive Advertising Bureau has created the following visual representation of the process[7]:



84.   Essentially, PubMatic's unique cookie ID and the BGI attached to it allows the demand side platform (on behalf of its advertiser clients) to connect the PubMatic cookie ID to the records of a given data subject identified through other identifiers developed through cookie syncing such that the identity of the data subject

---

[6] See https://www.sec.gov/Archives/edgar/data/1422930/000162828020016438/pubmatics-12020.htm

[7] http://data.iab.com/ecosystem.html

CLASS ACTION COMPLAINT
Jury Trial Demanded

becomes known and the demand side platform (advertiser) can better determine what advertisements to place in front of that data subject.

85.     Each bid request sends personal data to anyone who has access to the RTB bid stream.

86.     Upon information and belief, this personal data is disseminated to thousands of entities, the identities of which are likely even unknown to PubMatic. Thus, PubMatic cannot accurately determine who or what entities receive users' personal data and cannot control their use of said data.

87.     PubMatic shares this personal data with the knowledge that it will be shared further to an unknown set of recipients, some of whom are also data controllers, and who will use the personal data for profiling and/or targeting the data subjects with advertising.

88.     Further, by using cookie syncing, PubMatic is able to maintain integrations with hundreds of AdTech intermediaries so that the same identifiers are used by all parties in the online advertising ecosystem, including RTB.

89.     Websites then use PubMatic's services to record data subjects' visits and browsing behavior to enable the targeting of advertisements when data subjects visit their pages.

90.     PubMatic makes no effort to provide data subjects with a list of possible recipients of their personal data.

91.     PubMatic does not disclose to data subjects the identity of the companies with which PubMatic syncs cookies.

92.     The cookie ID placed and read by PubMatic and the BGI generated therefrom constitutes "personal data" within Article 4(1) of the GDPR.

93.     PubMatic sets and reads cookies on hundreds of the most trafficked websites in the UK, which appear to rely on digital advertising revenue.

CLASS ACTION COMPLAINT
Jury Trial Demanded

94.     These websites include a variety of sectors, such as news and information, banking, utilities, telecommunications, corporate, academic and charity sites, just to name a few.

95.     Approximately 11.7% of UK websites use PubMatic to track and identify users.

**PubMatic Fails to Process Personal Data Lawfully**

96.     In order for PubMatic to lawfully process personal data under the GDPR, PubMatic must either obtain consent by the data subject or have a legitimate interest. GDPR, Article 6(1)(a), (f).

97.     Consent of a data subject means any freely given, specific, informed and unambiguous indication of the data subject's wishes by which he or she, by a statement or by a clear affirmative action, signifies agreement to the processing of personal data relating to him or her.

98.     Recital 42 provides that for consent to be informed, the data subject should be aware at least of the identity of the controller and the purposes of the processing for which the personal data are intended.

99.     Further, Article 7, Conditions for Consent, provides:

   a. Where processing is based on consent, the controller shall be able to demonstrate that the data subject has consented to processing of his or her personal data.

   b. If the data subject's consent is given in the context of a written declaration which also concerns other matters, the request for consent shall be presented in a manner which is clearly distinguishable from the other matters, in an intelligible and easily accessible form, using clear and plain language. Any part of such a declaration which constitutes an infringement of this Regulation shall not be binding.

15

CLASS ACTION COMPLAINT
Jury Trial Demanded

c. The data subject shall have the right to withdraw his or her consent at any time. The withdrawal of consent shall not affect the lawfulness of processing based on consent before its withdrawal. Prior to giving consent, the data subject shall be informed thereof. It shall be as easy to withdraw as to give consent.

d. When assessing whether consent is freely given, utmost account shall be taken of whether, inter alia, the performance of a contract, including the provision of a service, is conditional on consent to the processing of personal data that is not necessary for the performance of that contract.

100.    PubMatic acknowledges in its policies that users have the right to decide whether to accept or reject cookies.

101.    PubMatic has failed to directly obtain consent from data subjects.

102.    PubMatic states in its consent policies that, "In some cases, we may rely on your consent, in the context of our Ad Services, which is obtained for us by our Clients that use our technology." In other words, sometimes PubMatic will rely on the consent obtained from the website publishers.

103.    PubMatic cannot, however, simply outsource or delegate its obligations for consent and then turn a blind eye to whether the publisher actually complies with the consent requirements. The Information Commissioner's Office ("ICO"), an independent regulatory office dealing with the DPA 2018 and the GDPR, stated in her June 2019 Adtech Report (page 21), that organizations cannot rely on standard terms and conditions by themselves without undertaking appropriate monitoring and ensuring technical and organization's controls back up those terms.[8] The ICO guidance states that controllers must assess that the processor is competent to process personal

---

[8] Information Commissioner's Office, Update report into adtech and real time bidding, June 20, 2019, accessible at https://ico.org.uk/media/about-the-ico/documents/2615156/adtech-real-time-bidding-report-201906-dl191220.pdf.

CLASS ACTION COMPLAINT
Jury Trial Demanded

data under the GDPR, put in place a contract or other legal act meeting GDPR compliance, and ensure a processor's compliance on an ongoing basis in order for the controller to comply with the accountability principle.

104. PubMatic's reliance on consent obtained by publishers is insufficient because: (1) users are unable to know when PubMatic claims to rely on publisher consent, (2) in most (if not all) instances, the publisher's consent is not sufficient under the GDPR, and (3) PubMatic fails to assure ongoing compliance.

105. At present date, the majority of websites that use PubMatic have non-compliant cookie banners and privacy policies, or no consent collection mechanism at all.

106. Because the vast majority of websites using PubMatic do not have fully compliant cookie banners, PubMatic cannot rely on first-party publishers to gather valid consent.

107. Further, specific names of data controllers receiving the cookie IDs and associated BGI were not fully disclosed to data subjects, including Mr. Elliott and Class Members, in advance, such that any consent received is not compliant.[9]

108. PubMatic clearly has no system in place to check whether its clients (the publishers) are obtaining valid consent.

109. Even when reading PubMatic's consent policy, users have no way of knowing whether PubMatic is relying on consent or legitimate interests.

110. As the controller of the data, PubMatic has the responsibility to ensure that consent is valid, but consistently fails to do so.

111. At no time was consent "freely given," "specific," "informed," and "unambiguous" by Mr. Elliott or Class Members.

---

[9] European Data Protection Board opinion on consent ("in a case where the consent sought is to be relied upon by multiple (joint) controllers or if the data is to be transferred to or processed by other controllers who wish to rely on the original consent, these organizations should all be named").

CLASS ACTION COMPLAINT
Jury Trial Demanded

112. Consent is the only lawful basis for PubMatic's processing because, under the Privacy and Electronic Communications (EC Directive) Regulations 2003/2426, cookies may only be lawfully placed on a device where the user has given his or her consent. The ICO made clear that, if consent is required under the Privacy and Electronic Communications Regulations, then the controller cannot rely on the full range of possible lawful grounds provided by Article 6 of the GDPR. Thus, in this case, PubMatic cannot rely on its legitimate interest.

113. The Privacy and Electronic Communications Regulations and the AdTech opinion of the ICO dated June 2019 make clear that the only lawful basis for "business as usual" Real-time Bidding processing of personal data is consent.

114. However, since PubMatic claims to rely on legitimate interest as a lawful ground, it will still be analyzed herein.

115. PubMatic states in its consent policy that it "normally rel[ies] on our (or our Clients) legitimate interests to collect and use your personal information."

116. Recital 47 of the GDPR states that:

> [t]he legitimate interests of a controller, including those of a controller to which the personal data may be disclosed, or of a third party, may provide a legal basis for processing, provided that the interests or the fundamental rights and freedoms of the data subject are not overriding, taking into consideration the reasonable expectations of data subjects based on their relationship with the controller. Such legitimate interest could exist for example where there is a relevant and appropriate relationship between the data subject and the controller in situations such as where the data subject is a client or in the service of the controller. At any rate the existence of a legitimate interest would need careful assessment including whether a data subject can reasonably expect at the time and in the context of the collection of the personal data that processing for that purpose may take place. The interests and fundamental rights of the data subject could in particular override the interest of the data controller where personal data are processed in circumstances where data subjects do not reasonably expect further processing. Given that it is for the legislator to provide by law for the legal basis for public

18

CLASS ACTION COMPLAINT
Jury Trial Demanded

authorities to process personal data, that legal basis should not apply to the processing by public authorities in the performance of their tasks. The processing of personal data strictly necessary for the purposes of preventing fraud also constitutes a legitimate interest of the data controller concerned. The processing of personal data for direct marketing purposes may be regarded as carried out for a legitimate interest.

117.   The ICO, in the same June 2019 Adtech report, found that "reliance on legitimate interests for marketing activities is possible only if organisations [sic] don't need consent under [Privacy and Electronic Communications Regulations] and are also able to show that their use of personal data is proportionate, has a minimal privacy impact, and individuals would not be surprised or likely to object. We believe that the nature of the processing within [Real-time Bidding] makes it impossible to meet the legitimate interests lawful basis requirements. This means that legitimate interests cannot be used for the main bid request processing. This is the case even if it were possible for legitimate interests to be applicable elsewhere in the RTB ecosystem...."

118.   A controller, including PubMatic, cannot claim a legitimate interest where such interests are overridden by the interests or fundamental rights and freedoms of the data subject which require protection of personal data.

119.   Essentially, a business' legitimate interest based upon its own commercial enterprise is self-serving and is not enough to satisfy the legitimate interest required by the GDPR.

120.   In order to legally rely on the legitimate interest basis, it is necessary for the controller to identify a legitimate interest, show that the processing in question is necessary to achieve it, and balance that interest against the individual's interests, rights, and freedoms.

121.   Further, to satisfy the legitimate interest purpose, PubMatic would have to undertake and provide a full assessment of the interests of the parties. Article 35 requires PubMatic to have conducted a Data Protection Impact Assessment. In fact,

CLASS ACTION COMPLAINT
Jury Trial Demanded

the ICO made clear in its June 2019 AdTech report that Data Protection Impact Assessments are mandatory for processing through the Real-time Bidding system.

122.    No such assessment was disclosed or provided by PubMatic to Mr. Elliott or Class Members.

123.    Thus, even though PubMatic is precluded by law from relying on its purported legitimate interests, PubMatic's own business interests are clearly overridden by the interests and fundamental rights and freedoms of Mr. Elliott and Class Members, particularly given the scale and intrusiveness of the processing.

124.    Therefore, PubMatic cannot rely on its purported legitimate interest to satisfy its compliance obligations under the GDPR.

125.    PubMatic, as the controller, is responsible for demonstrating compliance and accountability. PubMatic is unable to meet this obligation.

126.    PubMatic lacks a lawful basis for its use of data subjects' personal data, including Mr. Elliott and Class Members.

**PubMatic Lacks Transparency in Its Processing of Personal Data**

127.    Personal data shall be processed lawfully, fairly, and in a transparent manner in relation to the data subject. Article 5(1)(a) ("lawfulness, fairness, and transparency").

128.    By creating and sharing the unique cookie ID and other BGI with other data controllers (who use the personal data for profiling and targeting), PubMatic has processed the personal data of data subjects, including Mr. Elliott and Class Members, without a lawful basis and without meeting the requirement for transparency in processing.

129.    In addition to transparency being listed as one of the requirements in Article 5(1)(a), separate requirements exist in Articles 13 and 14, which are frequently treated together and place requirements on controllers to provide certain information to the data subjects.

CLASS ACTION COMPLAINT
Jury Trial Demanded

130.   Specifically, Article 13(1) requires a controller who collects personal data to provide to the data subjects information, such as:

    a.  The identity and the contact details of the controller and, where applicable, of the controller's representative;

    b.  The contact details of the data protection officer, where applicable;

    c.  The purposes of the processing for which the personal data are intended, as well as the legal basis for the processing;

    d.  Where the processing is based on point (f) of Article 6(1), the legitimate interests pursued by the controller or by a third party;

    e.  The recipients or categories of recipients of the personal data, if any; and

    f.  Where applicable the fact that the controller intends to transfer personal data to a third country or international organization, the existence or absence of relevant adequacy regulations under section 17A of the 2018 Act, or reference to the appropriate or suitable safeguards and the means to obtain them.

131.   Article 13(2) further requires disclosure of the following information necessary to ensure fair and transparent processing:

    a.  Period for which personal data will be stored;

    b.  Existence of the right to request access or restrict processing or object to processing;

    c.  The existence of the right to withdraw consent at any time;

    d.  The right to lodge a complaint with the Commissioner;

    e.  Whether the provision of personal data is a statutory or contractual requirement or necessary to enter into a contract; and

    f.  Existence of automated decision making.

132.   Articles 14(1)-(2) have nearly identical disclosure requirements.

CLASS ACTION COMPLAINT
Jury Trial Demanded

133.   In addition to the controller providing the information listed in Articles 13 and 14, the notification should be provided in a concise, transparent, intelligible, and easily accessible form, using clear and plain language.

134.   Recital 39 of the GDPR provides, in relevant part, that "any processing of personal data should be lawful and fair. It should be transparent to natural persons that personal data concerning them are collected, used, consulted or otherwise processed and to what extent the personal data are or will be processed. The principle of transparency requires that any information and communication relating to the processing of those personal data be easily accessible and easy to understand, and that clear and plain language be used. That principle concerns, in particular, information to the data subjects on the identity of the controller and the purposes of the processing and further information to ensure fair and transparent processing in respect of the natural persons concerned and their right to obtain confirmation and communication of personal data concerning them which are being processed."

135.   Recital 60 of the GDPR provides that, "The principles of fair and transparent processing require that the data subject be informed of the existence of the processing operation and its purposes. The controller should provide the data subject with any further information necessary to ensure fair and transparent processing taking into account the specific circumstances and context in which the personal data are processed. Furthermore, the data subject should be informed of the existence of profiling and the consequences of such profiling. Where the personal data are collected from the data subject, the data subject should also be informed whether he or she is obliged to provide the personal data and of the consequences, where he or she does not provide such data. That information may be provided in combination with standardised [sic] icons in order to give in an easily visible, intelligible and clearly legible manner, a meaningful overview of the intended processing. Where the icons are presented electronically, they should be machine-readable."

CLASS ACTION COMPLAINT
Jury Trial Demanded

136.   PubMatic completely fails to satisfy Article 5(1)(a) regarding transparency and Articles 13 and 14 as it does not provide any of the required information to data subjects, including Mr. Elliott and Class Members.

137.   PubMatic violates the transparency principle as data subjects, including Mr. Elliott and Class Members, do not know and seldom can discover what data is held on them, where that data is held, to whom it is transferred, and how it is processed.

138.   In fact, most (if not all Class Members) never interact with PubMatic at all.

139.   PubMatic's failure to name the recipients of the personal data is a further breach of transparency in its processing.

140.   Personal data shall also be collected for specified, explicit and legitimate purposes and not further processed in a manner that is inconsistent with those purposes. Article 5(1)(b) ("purpose limitation").

141.   PubMatic's scope of processing and use of personal data of the data subjects, including Mr. Elliott and Class Members, far exceeds what is specified to the data subjects at the point where the personal data is collected or produced.

142.   Personal data shall be processed in a manner that ensures appropriate security of the personal data, including protection against unauthorized or unlawful processing and against accidental loss, destruction or damage, using appropriate technical or organizational measures. Article 5(1)(f) ("integrity and confidentiality").

143.   PubMatic's actions, including cookie syncing and its sharing of data subjects' personal data without proper monitoring, are done in such a way that PubMatic is prevented from appropriately protecting and ensuring confidentiality and security of the personal data of data subjects, including Mr. Elliott and Class Members.

144.   PubMatic's processing of personal data via the creation of unique cookie IDs and the collection of associated BGI constitutes intrusive, extensive, and unexpected loss of control of personal data.

CLASS ACTION COMPLAINT
Jury Trial Demanded

145.   As the controller involved in processing, PubMatic is liable for the damage caused by its processing, which infringes the GDPR.

146.   Mr. Elliott and the Class Members have suffered injury from PubMatic's use and transmission of their personal data in the form of loss of control of their personal data.

147.   Once the personal data is shared across AdTech platforms, it cannot realistically be recovered or reverted to private, personal information.

148.   Article 82 of the GDPR provides that any person who has suffered material or non-material damage as a result of an infringement of the GDPR shall have the right to receive compensation from the controller or processor for the damage suffered.

149.   According to Sir Geoffrey Vos Chancellor of the High Court in *Lloyd v. Google*, [2019] EWCA Civ. 1599, "Damages are in principle capable of being awarded for loss of control of data under article 23 and section 13, even if there is no pecuniary loss and no distress."[10]

## **PLAINTIFF'S FACTS**

150.   Mr. Elliott is a citizen of the United Kingdom where he resides.

151.   Mr. Elliott is a "data subject" as that term is defined in Article 4(1) of the GDPR.

152.   At some point prior to filing this lawsuit, PubMatic placed a unique cookie ID and numerous syncing cookies on Mr. Elliott's device.

153.   Specifically, as of the time of filing this suit, Mr. Elliott has 45 PubMatic cookies on his Chrome browser, including the uniquely identifying cookie called

---

[10] This reference is to the predecessor legislation, but the same conclusion applies to Article 82. *See* ¶¶ 64-65 of *Lloyd v. Google*.

CLASS ACTION COMPLAINT
Jury Trial Demanded

KADUSERCOOKIE with ID 8885AEF6-AE82-4E20-B2B6-47C1B70A4731, as well as "syncing" cookies.

154.   PubMatic used this unique cookie ID and the syncing cookies placed on Mr. Elliott's device to record Mr. Elliott's visits to websites and his BGI to collect and associate his website browsing behavior.

155.   Mr. Elliott's cookie ID and the BGI constitute "personal data" within the definitions of that term under Article 4(1) of the GDPR.

156.   At all relevant times, Mr. Elliott was unaware of PubMatic's use and transmission of his personal data.

157.   At the time of the cookie placement, Mr. Elliott had no idea that PubMatic placed cookies on his device, let alone processed and controlled his personal data.

158.   Mr. Elliott did not consent to PubMatic's use and transmission of his personal data.

159.   PubMatic did not have a legitimate interest in its use of Mr. Elliott's personal data.

160.   PubMatic had and has no lawful basis for using, processing, and transmitting Mr. Elliott's personal data.

161.   PubMatic was not transparent with Mr. Elliott with regards to his personal data.

162.   Such use of Mr. Elliott's personal data is a violation of the Data Protection Principles set out in Article 5 of the GDPR and the rights provided for in Chapter 3 of the GDPR.

163.   Mr. Elliott was injured by PubMatic's use, processing, and transmission of his personal data as he suffered a loss of personal data and privacy.

## JURISDICTION IS MOST APPROPRIATE IN CALIFORNIA

164.   PubMatic's corporate offices and principle place of business is in California.

CLASS ACTION COMPLAINT
Jury Trial Demanded

165.   At least one of PubMatic's data center facilities is in California, such that at least a portion of the conduct complained of herein occurred in California.

166.   The United Kingdom is not the proper forum. PubMatic never purposefully subjected itself to personal jurisdiction in the United Kingdom.

167.   PubMatic has evaded its corporate registration in the United Kingdom, as it has failed to register with the ICO, UK's independent authority set up to uphold information rights in the public interest and which promotes openness by public bodies and data privacy for individuals, as required by the DPA 2018.

168.   PubMatic does appear to have a minor presence in the United Kingdom under an entity called PubMatic Limited. However, based upon public filings, there is no indication this entity actually performed or performs the actions complained of herein and Pubmatic Limited also evaded registration with the ICO.

169.   Private and public interest factors weigh in favor of California as the proper forum. In terms of private interests, the majority of the evidence in this case, other than the harm, is in California. Convenience of the parties also favors California over the United Kingdom, as PubMatic's business records, executives, engineers, and other relevant witnesses are located in California. In short, evidence of Mr. Elliott and Class Members' harm is in the United Kingdom, but evidence of PubMatic's wrongdoings is in California. California is convenient to PubMatic, as it is headquartered in California. In terms of public interest factors, California has a significant interest because the state must ensure that California companies and those that choose California as a business headquarters are held accountable in the jurisdiction they choose when they perform activities that are unlawful and affect the privacy of others. This Court is best suited to hear this case, not only because this case meets jurisdictional requirements, but because it has been contractually chosen by

CLASS ACTION COMPLAINT
Jury Trial Demanded

PubMatic.[11] Further, the GDPR is quite straightforward and easy to understand, such that application of foreign law should not be a burden.

170.   California is the proper venue for this litigation.

## CHOICE OF LAW ANALYSIS FAVORS APPLYING
## THE SUBSTANTIVE LAW OF THE GDPR

171.   Under the EU GDPR Article 82(6), court proceedings for exercising the right to compensation must be brought in one of the EU Member States referred to in Article 79(2). However, following Brexit on January 1, 2021, the DPA 2018 amended this portion of the GDPR to remove this jurisdictional requirement, showing a willingness for GDPR claims to be brought outside of the UK and the EU.

172.   Commentary of the GDPR makes clear that it has extra-territorial scope. For example, in a December 2, 2019 Data Post discussing the Extra-territoriality of the GDPR, the post outlines how Article 3 "aims to determine whether a particular processing activity is within the scope of the GDPR and not whether an entity is within the scope of the GDPR (i.e. a non-EU controller can be caught with respect to some data and processing…)"[12] The post goes on to say that "the GDPR seeks (via Article 3) to extend its reach beyond European borders, making non-EU organisations [sic] directly subject to its obligations when processing personal data…"

173.   In sum, the GDPR was developed to protect personal data of data subjects within the EU and UK, regardless of where the conduct occurred or the defendant resides. Thus, the substantive laws of the United Kingdom's GDPR should be applied.

---

[11] See https://pubmatic.com/legal/publisher-master-services-agreement/#Choice
SECTION 11 – CHOICE OF LAW & VENUE. This Agreement shall be construed and interpreted under the laws of the State of California without giving effect to California's principles of conflict of laws, and the parties hereby submit to the exclusive jurisdiction of, and waive any venue objections against the state and federal courts located in Santa Clara County, California and the Borough of Manhattan in New York, New York in any dispute arising under or in connection with this Agreement.
[12] The full Data Post can be found at https://hsfnotes.com/data/2019/12/02/edpb-adopts-final-guidelines-on-gdpr-extra-territoriality/.

CLASS ACTION COMPLAINT
Jury Trial Demanded

174.   California substantive law should not be applied, as there is a compelling reason to displace it in favor of the GDPR under the laws of the United Kingdom.

175.   The United Kingdom is the jurisdiction with a true interest in having its laws applied to this case, as it has an interest in protecting the data privacy of its citizens, regardless of where the potential defendant is domiciled or its conduct occurs. In fact, the drafters of the GDPR anticipated this situation while drafting Article 3, which is intended to apply extra-territorially. Further, the United Kingdom has an interest in having its laws applied to injuries that occur within its borders to its citizens residing within the United Kingdom.

176.   The nature and strength of the United Kingdom's interest in the application of its own law, specifically the GDPR, is overwhelming. The GDPR was developed specifically to protect its citizens from the exact actions complained of herein against PubMatic. Alternatively, the United Kingdom's interest would be more impaired if its policy were subordinated to the policies of California, such that the laws of the United Kingdom should be applied.

## CLASS ACTION ALLEGATIONS

177.   Plaintiff brings this action individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) seeking injunctive and monetary relief for PubMatic's systematic failure to comply with the GDPR.

**A.**   **Class Definition**

178.   Plaintiff brings this action on behalf of the following class:

> **Class: All persons residing or who resided in England and Wales who used Chrome, Edge, or Internet Explorer browser and have had a PubMatic cookie placed on their device during the Relevant Time Period.**

179.   Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, employees, counsel, officers, agents, and directors. Also excluded are any

28

1  judicial officers presiding over this matter and the members of their immediate
2  families and judicial staff.

3        180.   The Relevant Time Period is from May 25, 2018 through the present.

4        181.   Plaintiff reserves the right to amend the Class definition if discovery and
5  further investigation reveal that the Class should be expanded, divided into subclasses
6  under Rule 23(c)(5), or modified in any other way.

7        182.   Plaintiff is a member of the Class he seeks to represent.

8        183.   The unlawful personal data use practices described herein have been and
9  are continuing in nature.

10   **B.    Rule 23(a) and Rule 23(b)(3) Requirements**

11   **a.    Numerosity**

12        184.   The proposed Class is so numerous that joinder of all Members is
13  impracticable.

14        185.   Upon information and belief, the Class size is estimated at approximately
15  30 million individuals.

16        186.   The Class Members are ascertainable through PubMatic's centralized
17  and electronically-maintained records. Class Members are also able to self-identify by
18  simply checking to see if they have the PubMatic cookie (KADUSERCOOKIE) on their
19  device.

20   **b.    Commonality**

21        187.   The prosecution of Plaintiff's claims will require the adjudication of
22  numerous questions of law and fact common to the Class. The common questions of
23  law and fact predominate over any questions affecting only individual Class Members.
24  The common questions include:

25        a.      Whether PubMatic's Terms & Conditions comply with the GDPR;

26        b.      Whether PubMatic obtained valid consent for the use of Mr. Elliott and
27                the Class Members' personal data;

28

CLASS ACTION COMPLAINT
Jury Trial Demanded

c.  Whether PubMatic has a legitimate interest for the processing of Mr. Elliott and the Class Members' personal data;

d.  Whether PubMatic processed data lawfully, fairly, and in a transparent manner;

e.  Whether PubMatic has damaged Mr. Elliott and the Class Members through use of their personal data;

f.  Whether the Class is entitled to damages and the amount of damages;

g.  Whether PubMatic should be enjoined from continuing to be out of compliance with the GDPR;

h.  Whether the GDPR should apply to Mr. Elliott and the Class Members' claims; and

i.  In other ways as shown in discovery.

**c.  Typicality**

188.  Plaintiff has suffered the same violations and similar injuries as other Class Members arising out of and caused by PubMatic's common course of conduct. All Class Members were subject to the same corporate practices as alleged herein, in particular, by having a unique cookie ID placed on their device, which constituted personal data, and which was unlawfully shared with an unknown number of entities.

189.  Mr. Elliott possesses and asserts each of the claims he asserts on behalf of the proposed Class.

190.  Mr. Elliott seeks similar relief as other Class Members.

**d.  Adequacy of Representation**

191.  Mr. Elliott is an adequate class representative.

192.  Mr. Elliott's interests are coextensive with those of the Members of the proposed Class. Mr. Elliott is willing and able to represent the proposed Class fairly and vigorously as he pursues his similar individual claims in this action.

193.   Mr. Elliott will fairly and adequately protect the interests of the Class because he has no interests antagonistic to, or in conflict with, the Class that Mr. Elliott seeks to represent.

194.   Mr. Elliott has retained counsel sufficiently qualified, experienced, and able to conduct this litigation and to meet the time and fiscal demands required to litigate a class action of this size and complexity.

**e.      Predominance & Superiority**

195.   A class action is superior to other available means for the fair and efficient adjudication of this controversy.

196.   A class action is superior to other available methods for the fair and efficient adjudication of the controversy, particularly where individual Class Members lack the financial resources to vigorously prosecute a lawsuit against a large corporation such as PubMatic.

197.   Class action treatment will permit a large number of similarly situated persons to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

198.   The prosecution of separate actions by individual Members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual Members of the Class, establishing incompatible standards of conduct for PubMatic and resulting in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties.

199.   The issues in this class action can be decided by means of common, class-wide proof. In addition, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

200.   PubMatic has acted on grounds generally applicable to Plaintiff and the proposed Class by adopting and following systematic policies, practices, and procedures that unlawfully gather and transmit personal data.

31

201.   PubMatic has acted or refused to act on grounds generally applicable to Plaintiff and Class Members by failing to obtain proper consent or failure to have a legitimate interest. PubMatic's systematic conduct justifies the requested injunctive and declaratory relief with respect to the Class as a whole.

**f.   Injunctive/Declaratory Relief**

202.   Injunctive, declaratory, and affirmative relief are a predominate form of relief sought in this case. Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of PubMatic's refusal to comply with the GDPR. In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for the monetary and non-monetary remedies for losses caused by PubMatic's systemic unlawful use of personal data.

**C.   Requirements of Rule 23(c)(4) Issue Certification**

203.   Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all Class Members.

**FIRST CLAIM FOR RELIEF**

**Violation of the General Data Protection Regulation (EU) 2016/679**

204.   Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

205.   PubMatic's conduct, as described herein, was and is in violation of the GDPR.

206.   Plaintiff and Class Members are "data subjects," as defined in Article 4(1) of the GDPR.

207.   PubMatic is a "controller," as defined in Article 4(7) of the GDPR.

208.   The cookie IDs and BGI are "personal data," as defined in Article 4(1) of the GDPR.

CLASS ACTION COMPLAINT
Jury Trial Demanded

209.   In processing Mr. Elliott and the Class Members' personal data, PubMatic must act lawfully, fairly, and in a transparent manner.

210.   PubMatic's conduct violates the GDPR in at least the following ways:

a.  PubMatic does not process the personal data of data subjects, including Mr. Elliott and Class Members, lawfully, as it fails to have a legal basis for its processing. PubMatic fails to obtain valid consent and fails to have a legitimate business interest.

b.  By creating and sharing the unique cookie ID and other BGI with other data controllers (who use the personal data for profiling and targeting), PubMatic has processed the personal data of data subjects, including Mr. Elliott and Class Members, without a lawful basis and without meeting the requirement for transparency in processing.

c.  PubMatic violates the transparency principle as data subjects, including Mr. Elliott and Class Members, do not know and seldom can discover what data is held on them, where that data is held, to whom it is transferred, and how it is processed.

d.  PubMatic breaches the principle of transparency because it provides no information to data subjects, including Mr. Elliott and Class Members, regarding what personal data is being processed and because the onward transmission of data, including to whom the data is passed, is not disclosed.

e.  PubMatic's failure to name the recipients of the personal data is a breach of transparency in processing.

f.  PubMatic's scope of processing and use of personal data of the data subjects, including Mr. Elliott and Class Members, far exceeds what is specified to the data subjects at the point where the personal data is collected or produced.

33

g. PubMatic's actions, including cookie syncing and its sharing of data subjects' personal data without proper monitoring, are done in such a way that PubMatic is prevented from appropriately protecting and ensuring confidentiality and security of the personal data of data subjects, including Mr. Elliott and Class Members.

h. PubMatic completely fails to satisfy Articles 13-14, as it does not provide any of the required information to data subjects, including Mr. Elliott and Class Members.

i. PubMatic's processing of personal data via the creation of unique cookie IDs and the collection of associated BGI constitutes intrusive, extensive, and unexpected loss of control of personal data.

211. The conduct herein has caused loss to Mr. Elliott and the Class Members.

212. As the controller involved in processing, PubMatic is liable for the damage caused by its processing which violates the GDPR.

213. PubMatic's actions alleged herein caused Mr. Elliott and the Class Members to have their personal data shared with unknown sources without adequate consent or a legitimate business interest, thereby causing injury.

214. Accordingly, Plaintiff and the Class Members have suffered injury in fact, including the loss of personal data and privacy, as a result of PubMatic's lack of a lawful basis for processing and lack of transparency for which compensation should be awarded under Article 82 of the GDPR.

215. Mr. Elliott seeks to enjoin further unlawful acts or practices by PubMatic.

216. Mr. Elliott requests that this Court enter such orders or judgments as may be necessary to enjoin PubMatic from continuing its unlawful practices and to compensate Mr. Elliott and the Class Members for the injuries each sustained, as

CLASS ACTION COMPLAINT
Jury Trial Demanded

provided in Article 82 of the GDPR, and for such other relief set forth below, including, but not limited to Plaintiff's attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Elliott and the Class request that the Court enter an order granting the following relief:

1. That the Court certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2. That the Court name Plaintiff as Class Representative and his counsel as Class Counsel;

3. That Mr. Elliott and the Class have and recover injunctive relief as appropriate;

4. That Mr. Elliott and the Class have and recover from PubMatic damages for PubMatic's violation of the GDPR;

5. That the Court award attorneys' fees to Plaintiff and any other applicable law;

6. That the Court award Plaintiff and the Class pre-judgment and post-judgment interest at the highest legal rate provided by law;

7. That all costs of this action be taxed against PubMatic; and

8. That the Court award Mr. Elliott and the Class such other and further relief as this Court may deem just and proper.

PLAINTIFF DEMANDS A TRIAL BY JURY.

*Signature on following page*

CLASS ACTION COMPLAINT
Jury Trial Demanded

This the 2nd day of March, 2021.

BY: /s/ Alex R. Straus
Alex R. Straus (SBN 321366)
**WHITFIELD BRYSON LLP**
16748 McCormick Street
Los Angeles, CA 91436
(917) 471-1894 (phone)
(615) 921-6501 (fax)
astraus@whitfieldbryson.com

Daniel Bryson (*pro hac vice to be filed*)
Andrew Hathaway (*pro hac vice to be filed*)
**WHITFIELD BRYSON LLP**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
dan@whitfieldbryson.com
drew@whitfieldbryson.com

Caroline Ramsey Taylor
(*pro hac vice to be filed*)
**WHITFIELD BRYSON LLP**
518 Monroe Street
Nashville, TN 37208
(615) 921-6500 (phone)
(615) 921-6501 (fax)
caroline@whitfieldbryson.com

Gregory F. Coleman (*pro hac vice to be filed*)
William A. Ladnier (CA Bar No. 330334)
**GREG COLEMAN LAW PC**
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
T: 865-247-0080
F: 865-522-0049
greg@gregcolemanlaw.com
will@gregcolemanlaw.com

*Counsel for Plaintiff*

CLASS ACTION COMPLAINT
Jury Trial Demanded