Alex R. Straus (SBN: 321366)
Whitfield Bryson LLP
16748 McCormick Street
Los Angeles, CA 91436
Telephone:   (917) 471-1894
Facsimile:   (615) 921-6501
astraus@whitfieldbryson.com

[ADDITIONAL COUNSEL LISTED ON SIGNATURE PAGE]

*Counsel for Plaintiff*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| HUGO ELLIOTT, on behalf of himself and all others similarly situated,<br><br>            Plaintiff,<br><br>      v.<br><br>PUBMATIC, INC.,<br><br>            Defendant. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |

CASE NO. 4:21-cv-01497-PJH

**FIRST AMENDED CLASS ACTION COMPLAINT**

**JURY TRIAL DEMANDED**

1

Plaintiff Hugo Elliott, individually, and on behalf of all others similarly situated, brings this Class Complaint against Defendant PubMatic, Inc. ("PubMatic") and alleges the following:

**<u>INTRODUCTION</u>**

1.    PubMatic is a digital advertising technology company that develops online software and strategies for the digital publishing and advertising industry aimed at reaching target audiences across advertising formats and devices through the use and dissemination of personal data.

2.    The General Data Protection Regulation in force in the United Kingdom at the time of this Complaint ("UK GDPR") requires businesses to protect the personal data and privacy of natural persons.

3.    The principles of lawfulness, transparency, and accountability are fundamental conditions for processing personal data under the UK GDPR.

4.    PubMatic creates and places unique identifiers in the form of cookie IDs on internet users' devices which allow it to read and share personal data from that user.

5.    These cookie IDs and the data that they allow PubMatic to collect constitute personal data protected by the UK GDPR.

6.    Pursuant to the UK GDPR, in order to perform the activities that PubMatic is performing, it must have a lawful basis, generally through consent of the data subject.

7.    Any consent obtained from data subjects is inadequate because it is either non-existent or not compliant with the UK GDPR.

8.    PubMatic cannot rely on its legitimate interest in processing personal data, as such reliance is precluded by both the UK GDPR and regulatory authorities. However, even if it were not precluded as a matter of law, the balance of interests

2

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

required to be undertaken by PubMatic in order to rely on this basis of lawful processing does not support PubMatic's processing of personal data.

9.     As such, PubMatic lacks a lawful basis for processing personal data.

10.    PubMatic's processing of personal data without a lawful basis via the action of creating and reading unique cookie IDs and the collection of associated browser-generated information constitutes intrusive, extensive, and unexpected loss of control of the users' personal data in violation of the UK GDPR.

11.    PubMatic also lacks transparency due to the inadequate or non-existent communication with users, defined under the UK GDPR as "data subjects", in violation of Articles 5(1)(a) and Articles 13-14 of the UK GDPR.

12.    Plaintiff Hugo Elliott is a victim of PubMatic's blatant disregard for the privacy rights set forth in the UK GDPR.

13.    Mr. Elliott suffered a concrete and particularized injury of loss of control of his personal data through PubMatic's actions complained of herein.

14.    Mr. Elliott files this action to recover the damages he, as well as thousands of other residents of the United Kingdom, have incurred from PubMatic's wrongful conduct and to stop PubMatic's unlawful practices of gathering, processing, and disseminating users' personal data without proper consent.

## PARTIES

15.    Mr. Hugo Elliott is a citizen of London, United Kingdom.

16.    Mr. Elliott is a "data subject" as that term is defined in Article 4(1) of the UK GDPR.

17.    PubMatic was incorporated, and is existing, under the laws of the State of Delaware.

18.    PubMatic's principal place of business is in Redwood City, California.

19.    PubMatic was and is a "controller" as defined in Article 4(7) of the UK GDPR.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

## JURISDICTION AND VENUE

20.     This Court has subject matter jurisdiction over Mr. Elliott's claims pursuant to 28 U.S.C. § 1332(d), the Class Action Fairness Act. The amount in controversy exceeds $5,000,000, exclusive of attorneys' fees, pre-judgment interest, and costs, there are members of the proposed Class who are citizens or subjects of a foreign state, and PubMatic is a citizen of California.

21.     This Court also has subject matter jurisdiction over Mr. Elliott's claims pursuant to 28 U.S.C. § 1332(a) because the amount in controversy exceeds $75,000 and because complete diversity exists as PubMatic is a citizen of California while Mr. Elliott and the putative class members are domiciled in the United Kingdom.

22.     This Court may exercise personal jurisdiction over PubMatic because PubMatic conducts substantial business in this State and within the Northern District of California and receives substantial compensation and profits from the activities it undergoes in this District.

23.     Venue is proper in this District under 28 U.S.C. § 1391(a), as PubMatic resides in this District and under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in this District.

24.     California is the most convenient forum for this litigation, as PubMatic specifically submitted to the exclusive jurisdiction and waiver of any venue objections against the state and federal courts located in Santa Clara County, California or the Borough of Manhattan in New York in any dispute arising under or in connection with their Master Services Agreement.[1]

25.     The United Kingdom is not the proper jurisdiction because PubMatic has never purposefully subjected itself to personal jurisdiction in the United Kingdom.

---

[1] See Section 11 "Choice of Law & Venue" at https://pubmatic.com/legal/publisher-master-services-agreement/#Choice.

4

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

## INTRADISTRICT ASSIGNMENT

26.     This action is properly assigned to the San Francisco Division of this District pursuant to N.D. Cal. L.R. 3-2, because PubMatic's principal place of business is in San Mateo County, which is served by the San Francisco Division. Moreover, PubMatic conducts substantial business in San Mateo County, which is served by this Division.

## LEGAL FRAMEWORK

### Request for Application of Foreign Law

27.     Mr. Elliott and the Class Members plead foreign law in accordance with Federal Rule of Civil Procedure 44.1, which provides:

> A party who intends to raise an issue about a foreign country's law must give notice by a pleading or other writing. In determining foreign law, the court may consider any relevant material or source, including testimony, whether or not submitted by a party or admissible under the Federal Rules of Evidence. The court's determination must be treated as a ruling on a question of law.

28.     The General Data Protection Regulation was originally passed on April 14, 2016 and went into effect on May 25, 2018 within the European Union ("EU GDPR").

29.     The Data Protection Act 2018 is the UK's implementation of the EU GDPR.

30.     Throughout this Complaint, Mr. Elliott will refer to the applicable GDPR within the United Kingdom, which is the law at issue in this case, as the UK GDPR.

31.     The UK GDPR is a regulation that lays out rules relating to the protection of natural persons with regard to the processing of personal data, and rules relating to the free movement of personal data in the United Kingdom.

32.     As of January 1, 2021, the United Kingdom's withdrawal from the European Union was completed. As such, residents of the UK are no longer covered under the EU GDPR, but are instead protected under UK GDPR.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

33.     Significantly, UK data protection law contains materially identical obligations to the EU GDPR as a consequence of the European Union (Withdrawal) Act 2018 and the Data Protection, Privacy and Electronic Communications (Amendments ETC) (EU Exit) Regulations 2019. A full comparison of the EU GDPR to what has been adopted in the UK is available at: https://assets.publishing.service.gov.uk/government/uploads/system/uploads/attachm ent_data/file/946117/20201102_-_GDPR_-_MASTER_Keeling_Schedule_with_changes_highlighted__V3.pdf.

34.     The vast majority of the original text of the EU GDPR, including all the material and relevant provisions as they relate to this case, are now contained in the UK GDPR.

35.     The only substantive amendment within the UK GDPR which is relevant to this Complaint is the removal of the requirement under the EU GDPR which required complaints to be filed in a European court under Article 82(6). Removal of this provision in the UK GDPR has enabled UK plaintiffs to sue outside of the UK, including within the United States.

36.     All claims brought in this case are brought under the UK GDPR.

37.     Attached hereto as Exhibit A is a full version of the UK GDPR, which now applies in England & Wales following the United Kingdom's exit from the European Union.

38.     The UK GDPR protects the fundamental rights and freedoms of natural persons and, in particular, their right to the protection of their personal data.

39.     The UK GDPR applies to the automated or structured processing of personal data, including processing in the course of an activity that falls outside the scope of EU law and processing in the course of an activity that falls within the scope of Chapter 2 of Title 5 of the Treaty on European Union. UK GDPR, Article 2.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

40.     The UK GDPR applies to the relevant processing of personal data of data subjects who are in the United Kingdom by a controller or processor not established in the United Kingdom, where the processing activities are related to the monitoring of data subjects' behavior as far as their behavior takes place within the United Kingdom. UK GDPR, Article 3(2)(b).

41.     The UK GDPR applies to the processing of personal data by a controller not established in the United Kingdom, but in a place where domestic law applies by virtue of public international law. UK GDPR, Article 3(3).

42.     "Personal data" is defined as any information relating to an identified or identifiable natural person ("data subject"). An identifiable natural person is one who can be identified, directly or indirectly, in particular by reference to an identifier such as a name, an identification number, location data, **an online identifier**, or to one or more factors specific to the physical, physiological, genetic, mental, economic, cultural, or social identity of that natural person. UK GDPR, Article 4(1) (emphasis added).

43.     Recital 30 of the UK GDPR provides, "Natural persons may be associated with online identifiers provided by their devices, applications, tools and protocols, such as internet protocol addresses, **cookie identifiers** or other identifiers such as radio frequency identification tags. This may leave traces which, in particular when combined with unique identifiers and other information received by the servers, may be used to create profiles of the natural persons and identify them." (Emphasis added.)

44.     Clearly, a uniquely identifying cookie ID falls within the definition of personal data.

45.     "Controller" is defined as the natural or legal person, public authority, agency, or other body which, alone or jointly with others, determines the purposes and means of the processing of personal data. UK GDPR, Article 4(7).

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

46.    The UK GDPR imposes an obligation on a controller to demonstrate compliance. According to Article 5(2), "The controller shall be responsible for, and be able to demonstrate compliance with, paragraph 1 ("accountability")."

47.    Personal data shall be processed lawfully, fairly, and in a transparent manner in relation to the data subject. Article 5(1)(a) ("lawfulness, fairness, and transparency").

48.    Personal data shall also be collected for specified, explicit, and legitimate purposes and not further processed in a manner that is inconsistent with those purposes. Article 5(1)(b) ("purpose limitation").

49.    Personal data shall be processed in a manner that ensures appropriate security of the personal data, including protection against unauthorized or unlawful processing and against accidental loss, destruction or damage, using appropriate technical or organizational measures. Article 5(1)(f) ("integrity and confidentiality").

50.    Pursuant to the UK GDPR, processing personal data is only lawful in certain circumstances. Specifically related to the claims herein[2], processing personal data shall be lawful only if:

      a.  The data subject has given consent to the processing of his or her personal data for one or more specific purposes; or

      b.  The processing is necessary for the purposes of the legitimate interests pursued by the controller or by a third party, except where such interests are overridden by the interests or fundamental rights and freedoms of the data subject which require protection of personal data.

51.    Consent of a data subject means any freely given, specific, informed and unambiguous indication of the data subject's wishes by which he or she, by a statement

---

[2] The UK GDPR provides other purposes which would make processing lawful. However, none of them are applicable to the facts of this case.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

or by a clear affirmative action, signifies agreement to the processing of personal data relating to him or her. UK GDPR, Article 4(11).

52.     The UK GDPR places additional requirements on data controllers, such as requiring the controller to provide certain information to the data subject. UK GDPR, Article 13-14.

53.     The UK GDPR provides a private right of action to a data subject who considers that his or her rights under the UK GDPR have been infringed as a result of the processing of his or her personal data in violation of the UK GDPR. UK GDPR, Article 79(1).

54.     Any person who has suffered material or non-material damage as a result of an infringement of the UK GDPR shall have the right to receive compensation from the controller or processor for the damage suffered. UK GDPR, Article 82(1).

55.     Loss of control of data is a form of damage under the UK GDPR.

56.     Any controller involved in processing **shall** be liable for the damage caused by processing which infringes the UK GDPR. UK GDPR, Article 82(2) (emphasis added).

57.     National regulators within the European Economic Area have issued significant fines for unlawful cookie placement in violation of the EU GDPR (which is substantively identical to UK GDPR) against Amazon[3] and Google.[4] Similarly, the European Union's highest court, the Court of Justice of the European Union (CJEU) has ruled to judicially sanction consent- and controllership-related breaches of third

---

[3] https://www.cnil.fr/en/cookies-financial-penalty-35-million-euros-imposed-company-amazon-europe-core

[4]  https://www.cnil.fr/en/cookies-financial-penalties-60-million-euros-against-company-google-llc-and-40-million-euros-google-ireland

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

party tracking behavior, such as PubMatic's unlawful conduct complained of herein (see the Planet 49 case[5] and the Fashion ID case[6]).

## COMMON FACTUAL ALLEGATIONS

### PubMatic's Actions

58.    PubMatic is a digital advertising technology business.

59.    PubMatic claims that it provides a specialized cloud infrastructure platform that enables real-time programmatic advertising transactions.

60.    PubMatic is a "controller," as defined in Article 4(7) of the UK GDPR.

61.    PubMatic is the legal person who determines the purposes and means of the processing of personal data.

62.    PubMatic willingly admits to being the controller of the data subjects' personal data in its privacy policy.[7] The privacy policy is required to state the identity of the "controller" under the UK GDPR which PubMatic identifies as PubMatic, Inc., a company located in the United States.

**Who is the controller of my data?** For the purposes of EU data protection legislation, PubMatic, Inc is the controller of your personal information.

63.    PubMatic is established in the United States, not the United Kingdom.

64.    PubMatic's Privacy Policy also states that because it is processing UK citizens data in the United States, it certifies its compliance with the EU-U.S. Privacy Shield Framework. It further states that it is committed to processing personal information received in the United States from the United Kingdom in reliance on the Privacy Shield Framework.

---

[5] https://curia.europa.eu/juris/liste.jsf?num=C-673/17

[6] https://curia.europa.eu/juris/liste.jsf?num=C-40/17

[7] PubMatic, Inc., is the party responsible for the management of your personal information jointly used by it and its affiliates. For the purposes of EU data protection legislation, PubMatic, Inc is the controller of your personal information.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

### EU-U.S. Privacy Shield and Swiss-U.S. Privacy Shield Status 

PubMatic, Inc., located in the United States, participates in and has certified its compliance with the EU-U.S. Privacy Shield Framework and the Swiss-U.S. Privacy Shield Framework. We are committed to processing all personal information received in the U.S. from European Economic Area ("EEA"), United Kingdom and Switzerland, respectively, in reliance on the Privacy Shield Framework. PubMatic Inc. has certified to the US Department of Commerce that PubMatic Inc. adheres to the Privacy Shield Principles in respect of all personal information received from the EEA, UK and Switzerland.

To learn more about the Privacy Shield Frameworks, and to view our certification, visit the U.S. Department of Commerce's Privacy Shield website: https://www.privacyshield.gov/welcome. A list of Privacy Shield participants is maintained by the Department of Commerce and is available at: https://www.privacyshield.gov/list.

65.     PubMatic's participation in the Privacy Shield means that it committed to fully comply with foreign law, including the UK GDPR.

66.     PubMatic's participation in the Privacy Shield further subjects itself to investigation and enforcement of any UK GDPR violations by the U.S. Federal Trade Commission.

67.     PubMatic is a supply side platform. This essentially means that it assists websites (known in the industry as "publishers") with their management and sale of advertising space.

68.     According to PubMatic's website, PubMatic's platform empowers independent app developers and publishers to control and maximize their digital advertising businesses and enables advertisers to drive return on investment by reaching and engaging their target audiences.

69.     Supply side platforms are a cornerstone of the infrastructure that allows targeted online advertising.

70.     As part of its business practices, PubMatic placed unique and therefore individuating identifiers in the form of cookies on Mr. Elliott's device and Class Members' devices (hereafter referred to as "setting cookies") and used those uniquely identifying cookies to monitor and track Mr. Elliott's and Class Members' behavior as it took place in the United Kingdom.

11

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

71.     The PubMatic cookie itself is simply a static text file stored by the user's browser. It is not this static file that is in breach of the UK GDPR, but the act of setting and reading this file. Any time the PubMatic cookie is interacted with is covered by the UK GDPR and it is these interactions, not the text file itself, that is the focus of this Complaint.

72.     The uniquely identifying PubMatic cookie is the "KADUSERCOOKIE." The KADUSERCOOKIE is a cookie with a cookie ID in the form of an alphanumeric string.

73.     Each KADUSERCOOKIE cookie ID is unique and, thus, uniquely identifies an individual user.[8]

74.     While not all cookies uniquely identify data subjects, the unique ID of PubMatic's KADUSERCOOKIE cookie does uniquely identify the data subject because it allows PubMatic as the data controller to single out individual users and their internet activity.

75.      The cookie ID, as an identification number, is thus considered personal data as defined by Article 4(1) of the UK GDPR.

76.     A unique cookie ID has been expressly denoted as personal data by the Information Commissioner's Office, a UK independent regulatory office which assists with enforcement of the UK GDPR.

77.     The cookie ID is created and assigned when PubMatic places a cookie on the data subject's computer.

78.     The placement of the cookie ID on data subject's browsers alone is sufficient injury to be actionable under the UK GDPR.

---

[8] Hereafter, this Complaint will refer to the PubMatic KADUSERCOOKIE as "the PubMatic cookie" and the PubMatic KADUSERCOOKIE ID as "the cookie ID."

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

79.    The unique cookie ID is then used to track data subjects across websites, while collecting personal information, through the reading of that cookie alongside gathering other personal data.

80.    PubMatic has processed a vast amount of personal data through the company's tracking, analyzing, profiling, and disclosure of personal data to third parties.

81.    PubMatic claims to process 1 trillion advertising bids per day, 134 billion daily ad impressions and up to 1.6 petabytes of data per day in its recent IPO prospectus.[9]

82.    Tracking natural persons across websites without a legal basis and without the data subject's  freely given, specific, informed, and unambiguous consent is a violation of the UK GDPR.

83.    The creation and assignment of unique identifiers (unique cookie IDs) to data subjects, the use of those unique identifiers to track data subjects across websites, and the subsequent analysis and sharing of data about the online behavior of data subjects identified with those unique cookie IDs constitutes the "processing of personal data" pursuant to Article 4(2).

84.    PubMatic is a data controller and processes the personal data of Mr. Elliott and class members without a legal basis as required under the UK GDPR.

85.    The purpose for which the unique PubMatic cookie ID is created and subsequently used is not fully disclosed to the data subject in advance.

86.    In fact, data subjects do not interact directly with PubMatic, but instead only interact through publishers' websites.

87.    PubMatic uses the unique cookie ID to record Mr. Elliott and Class Members' visits to websites and their browser-generated information ("BGI") on those

---

[9] See https://www.sec.gov/Archives/edgar/data/1422930/000162828020016438/pubmatics-12020.htm

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

websites, which includes activity and actions on the websites, such as playing video content, purchase behavior, and the location of where the user was when he accessed the websites.

88.     Online tracking using uniquely identifying cookies and the use of personal data collected via uniquely identifying cookies for behavioral advertising are activities which constitute processing of personal data such that it is subject to the UK GDPR.

89.     PubMatic admits in its Privacy Policy that:

    a. "We use and deploy tracking technologies to automatically collect certain information about the End Users and their devices. Some of this information (including, for example, unique identifiers stored in a cookie or mobile advertising IDs) may identify a particular computer or device and may be "personal data" in some jurisdictions, including the EU and the State of California."

    b. "We (and our partners or vendors) may collect this information the first time an End User interacts with a Publisher Client's Digital Property that uses our Ad Services, and we may combine and associate this information with information we (or our partners) may collect about the End User's interactions with other ads served through our Platform."

    c. "The information we collect includes:

        i. Browser and Device information, IP address, and identifiers assigned to a device, such as its iOS Identifier for Advertisers (IDFA), Android/Google Advertising ID (AAID or GAID), or other unique device identifier including identifiers stored in a cookie, ETag, or browser or web cache.

14

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

ii.   Information about an End User's behavior on our Publisher Clients' Digital Properties, such as activities or actions on those Digital Properties, session start/stop time, and geolocation.

iii.   Information about ads served, viewed, or clicked on, such as the type of ad, where the ad was served, whether the End User clicked on it, the number of times an End User has seen the ad, and whether the End User visited the Media Buyer's website or relevant app store and/or purchased or installed the product or service advertised."

90.   When the PubMatic cookie ID is set and the cookie information is read, information is sent to PubMatic's servers. As admitted in its Privacy Policy, such information sent includes the unique cookie ID, the website the user is visiting, the user's location data, including IP address, ads viewed and clicked, the "user-agent string," which is a list of information about the user's browser and operating system, and other user data.

91.   The cookie ID and the data collected by PubMatic from Mr. Elliott and Class Members constitute personal data pursuant to Article 4(1) of the GDPR because it is information relating to an identified or identifiable natural person.

92.   Specifically, the cookie ID functions as a unique identifier for data subjects, including Mr. Elliott and Class Members. Further, other data collected by PubMatic, such as BGI and individual's IP addresses, also constitutes personal data.

93.   In creating the cookie ID, and thus personal data, PubMatic is processing Mr. Elliott and Class Members' personal data without a lawful basis.

94.   In using the cookie ID to monitor Mr. Elliott and Class Members and/or gather BGI on them, PubMatic is processing Mr. Elliott's and the Class Members' personal data without a lawful basis.

15

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

95.   PubMatic engages in "cookie syncing" where it exchanges cookie-based information with other companies as a user browses websites.

96.   Cookie syncing is one of many advertising technology tools, referred to generally as "AdTech" in the industry, that helps agencies and brands target, deliver, and analyze digital advertising efforts.

97.   Cookie syncing between AdTech businesses involves one AdTech business sending information about the cookie ID it has assigned to a user with at least one other AdTech business, and receiving the cookie IDs that those other AdTech businesses have assigned to the same user. This permits the participating AdTech businesses to communicate about that user away from the user's device despite using different cookie IDs to identify that user.

98.   Specifically, PubMatic engages in cookie syncing by storing third-party cookies that reference the cookie IDs set by other AdTech businesses with which it has synced.

99.   Pursuant to Article 25(2), PubMatic shall ensure that by default personal data is not made accessible without the data subject's intervention to an indefinite number of natural persons.

100.   By engaging in cookie syncing, data subjects' unique cookie IDs, and potentially their BGI, are shared with any company with which PubMatic syncs cookies.  However, neither Mr. Elliott and Class Members are told the identity of these third parties, which means they cannot give informed consent to their personal data being shared with them as is required under the UK GDPR.

101.   Such cookie syncing is meant to allow advertisers and their service providers to identify the data subject while minimizing the number of cookie syncing calls on the data subject's browser.

102.   PubMatic describes in its Cookie and Other Similar Technologies Policy: "We use this cookie to correlate our user IDs [the PubMatic KADUSERCOOKIE

16

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

uniquely identifying cookie ID] with those of our partners (such as demand side platform clients or other advertising technology companies). We pass the information stored by the partner in this cookie to the partner when it is considering whether to purchase advertisements. This enables the partner to make better decisions about whether to display an advertisement to you."

103.    By using unique cookie IDs, BGI associated with those unique cookie IDs, and cookie syncing, PubMatic is able to help publishers monetize their websites by auctioning advertising slots, at the expense of the data subject's statutory rights under the UK GDPR.

104.    PubMatic initiates a bidding process by sharing data subjects' personal data, including BGI attached to the unique cookie IDs, into the Real-time Bidding ("RTB") system.

105.    The RTB system allows third parties to bid to target advertising to data subjects, and in this case Mr. Elliott and Class Members, when they visit websites.

106.     The advertising slots are then auctioned in the RTB system.

107.    The targeted advertising seeks to allow website advertisers to better spend their marketing dollars, allowing them to capitalize on their most targeted subjects while PubMatic unlawfully provides the personal data of data subjects, including Mr. Elliott and Class Members.

108.    In this process, PubMatic claims in its IPO prospectus to manage 134 billion ad impressions and 1 trillion advertiser bids daily in September 2020.[10]

109.    PubMatic submits bid requests from publishers it works with into the RTB system, which includes ad exchanges and demand side platforms.

110.    Demand side platforms then submit bid responses to PubMatic's bid requests.

---

[10] See Footnote 9.

17

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

111.   PubMatic arranges for the highest bidders to place their advertising in the available ad slot.

112.   The Interactive Advertising Bureau has created the following visual representation of the process[11]:



113.   Essentially, PubMatic's unique cookie ID and the BGI attached to it claims to allow the demand side platform (on behalf of its advertiser clients) to connect the PubMatic cookie ID to the records of a given data subject identified through other identifiers developed through cookie syncing such that the identity of the data subject becomes known and the demand side platform (advertiser) can better determine what advertisements to place in front of that data subject.

114.   Each bid request therefore sends personal data to any party who has access to the RTB bid stream.

115.   Upon information and belief, this personal data is disseminated to thousands of entities, the identities of which are likely even unknown to PubMatic. Thus, PubMatic cannot accurately determine who or what entities receive users' personal data and cannot control their use of said data.

---

[11] http://data.iab.com/ecosystem.html

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

116.   PubMatic shares this personal data with the knowledge that it will be shared further to an unknown set of recipients (in violation of Article 25(2)), some of whom are also data controllers, and who will use the personal data for profiling and/or targeting the data subjects with advertising.

117.   In fact, PubMatic admits as much in its December 2020 10-K: "We are unable to prevent DSPs from aggregating bid requests from publishers and directing it to their own buying platforms or even reselling such bid data to advertisers or third parties."[12]

118.   This goes to the very heart of the infringements of UK GDPR: consent cannot be valid if it is not specific and informed.

119.   As the ICO notes "This means you need to identify yourself, and also name any third party controllers who will be relying on the consent."[13]

120.   PubMatic admits that it is does not and cannot name all third party controllers and this leads to loss of control damage to the data subjects.

121.   Further, by using cookie syncing, PubMatic is able to maintain integrations with hundreds of other AdTech intermediaries so that the same identifiers are used by all parties in the online advertising ecosystem.

122.   Websites then use PubMatic's services to record data subjects' visits and browsing behavior to enable the targeting of advertisements when data subjects visit their pages.

123.   PubMatic makes no effort to provide data subjects with a list of possible recipients of their personal data.  Its Privacy Policy simply lists generically the types of third parties it "may" send data to, and uses industry jargon to do so. For example:

we use the information we collect for the following purposes:

---

[12] https://investors.pubmatic.com/static-files/bfc7ecdb-078c-450f-a595-2a43347ac0ab at 49.

[13] https://ico.org.uk/for-organisations/guide-to-data-protection/guide-to-the-general-data-protection-regulation-gdpr/consent/what-is-valid-consent/#what3

19

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

…To allow Publisher Clients to offer advertising inventory in their Digital Properties and Media Buyers to bid on and fill that inventory with relevant ads

124.   PubMatic does not disclose to data subjects the identity of the third parties with which PubMatic syncs cookies.

125.   The cookie ID placed and read by PubMatic and the BGI generated therefrom constitutes "personal data" within Article 4(1) of the UK GDPR.

126.   PubMatic is subject to the UK GDPR because its processing activities are related to the monitoring of data subjects' behavior while they are located within the United Kingdom.

127.   PubMatic sets and reads cookies on hundreds of the most trafficked websites in the UK, which appear to rely on digital advertising revenue.

128.   These websites include a variety of sectors, such as news and information, banking, utilities, telecommunications, corporate, academic and charity sites, just to name a few.

129.   Approximately 11.7% of UK websites use PubMatic to track and identify users.

130.   PubMatic's actions, both in setting the cookie ID and its subsequent monitoring of data subjects behavior constitute violations of the UK GDPR.

131.   PubMatic's systematic infringements of personal data rights allow it to collect more personal data than other regulatory compliant competitors, conferring an unfair competitive advantage to PubMatic over competitor businesses (many located in the US, and specifically in California) with UK GDPR-compliant business models.

### PubMatic Fails to Process Personal Data Lawfully

132.   In order for PubMatic to lawfully process personal data under the UK GDPR, PubMatic must obtain consent from the data subject. UK GDPR, Article 6(1)(a).

133.   Consent of a data subject means any freely given, specific, informed and unambiguous indication of the data subject's wishes by which he or she, by a statement

20

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

or by a clear affirmative action, signifies agreement to the processing of personal data relating to him or her.

134.   Recital 42 provides that for consent to be informed, the data subject should be aware at least of the identity of the data controller and the purposes of the processing for which the personal data are intended.

135.   Further, Article 7, Conditions for Consent, provides:

a.   Where processing is based on consent, the controller shall be able to demonstrate that the data subject has consented to processing of his or her personal data.

b.   If the data subject's consent is given in the context of a written declaration which also concerns other matters, the request for consent shall be presented in a manner which is clearly distinguishable from the other matters, in an intelligible and easily accessible form, using clear and plain language. Any part of such a declaration which constitutes an infringement of this Regulation shall not be binding.

c.   The data subject shall have the right to withdraw his or her consent at any time. The withdrawal of consent shall not affect the lawfulness of processing based on consent before its withdrawal. Prior to giving consent, the data subject shall be informed thereof. It shall be as easy to withdraw as to give consent.

d.   When assessing whether consent is freely given, utmost account shall be taken of whether, inter alia, the performance of a contract, including the provision of a service, is conditional on consent to the processing of personal data that is not necessary for the performance of that contract.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

136.   PubMatic acknowledges in its policies that users have the right to decide whether to accept or reject cookies.

137.   PubMatic has failed to directly obtain consent from data subjects.

138.   PubMatic states in its consent policies that, "In some cases, we may rely on your consent, in the context of our Ad Services, which is obtained for us by our Clients that use our technology." In other words, sometimes PubMatic will rely on the consent obtained from the website publishers.

139.   PubMatic cannot, however, simply outsource or delegate its obligations for consent and then turn a blind eye to whether the publisher actually complies with the consent requirements. The ICO stated in its June 2019 AdTech Report[14] at page 21, that organizations cannot rely on standard terms and conditions by themselves without undertaking appropriate monitoring and ensuring technical and organization's controls back up those terms.[15]

140.   In addition, PubMatic's reliance on consent obtained by publishers is insufficient because: (1) users are unable to know when PubMatic claims to rely on publisher consent, (2) in most (if not all) instances, the publisher's consent is not sufficient under the UK GDPR, and (3) PubMatic fails to assure ongoing compliance.

141.   PubMatic admits that "there are many circumstances in which it is difficult or impossible for us to monitor or evaluate [publishers, buyers, and data providers] compliance."[16] It goes on to state that it is "unable to prevent [Demand Side Platforms] from aggregating bid requests from publishers and directing it to their own buying platforms or even reselling such bid data to advertisers or third parties."

---

[14] https://ico.org.uk/about-the-ico/what-we-do/our-work-on-adtech/

[15] Information Commissioner's Office, Update report into adtech and real time bidding, June 20, 2019, accessible at https://ico.org.uk/media/about-the-ico/documents/2615156/adtech-real-time-bidding-report-201906-dl191220.pdf.

[16] See PubMatic's Dec. 31, 2020 10-K (https://investors.pubmatic.com/static-files/bfc7ecdb-078c-450f-a595-2a43347ac0ab) at 49.

---

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

142.   Through these quotes, PubMatic all but admits that it cannot be compliant with UK GDPR since it admits it is impossible to monitor compliance and it is unable to prevent reselling of data confirming a data subject's loss of control.

143.   At present, the majority of websites that enable the use of PubMatic cookies have non-compliant cookie banners and/or privacy policies, or no consent collection mechanism at all.  In addition, a number of websites place PubMatic cookies before the consent banner click boxes have even been selected by a visitor and in some cases irrespective of whether the data subject has clicked "I Consent" or "I Do Not Consent."

144.   For example, PubMatic's own website gives no option for consent, despite it immediately placing a unique identifying cookie on a data subject's device.



145.   Similarly, Goodereader.com, a website that Mr. Elliott visited and which PubMatic interacts with, has no cookie banner or option for consent prior to placing cookies.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH



146.    Additionally, Walesonline.co.uk, a website Mr. Elliott visited and which interacts with PubMatic, provides a cookie banner for consent but loads cookies before the consent is ever obtained.



FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

147.   Because the vast majority of websites using PubMatic do not have fully compliant cookie banners, PubMatic was in breach of its obligation to undertake "appropriate monitoring and ensuring technical and organization's controls back up those terms" as required by the ICO, and it clearly did not rely on first-party publishers to gather valid consent.

148.   Further, specific names of data controllers receiving the cookie IDs and associated BGI were not fully disclosed to data subjects, including Mr. Elliott and Class Members, in advance, such that any consent received was not compliant and therefore, not valid.[17]

149.   PubMatic clearly had no system in place to check whether its clients (the publishers) were obtaining valid consent and this continues to be the case.

150.   Even when reading PubMatic's consent policy, users have no way of knowing whether PubMatic is relying on consent or legitimate interests, as it is unclear as to when each lawful basis is used, as a result of deliberately obfuscatory and unclear language.

151.   The ICO takes the view that, where processing is originally based on consent, a data controller cannot subsequently switch the basis of processing and rely instead on legitimate interests. Switching the basis of processing in this way is confusing for data subjects, and retrospectively invalidates the basis on which any consent was sought and given. The problem is particularly acute when the data controller does not interact directly with data subjects but instead relies on website publishers to do so on its behalf which considerably increases the risk that the data

---

[17] European Data Protection Board opinion on consent ("in a case where the consent sought is to be relied upon by multiple (joint) controllers or if the data is to be transferred to or processed by other controllers who wish to rely on the original consent, these organizations should all be named").

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

subjects will be confused and misled about the basis on which their data is being processed.

152.    As the controller of the data, PubMatic has the responsibility to ensure that consent is valid, but consistently fails to do so.

153.    At no time was consent "freely given," "specific," "informed," and "unambiguous " by Mr. Elliott or Class Members.

154.    PubMatic cannot rely on its legitimate interest in processing personal data.

155.    Consent is the only lawful basis for PubMatic's processing of Mr. Elliott and Class Members personal data.

156.    Numerous sources support this conclusion.

157.    Pursuant to the Privacy and Electronic Communications (EC Directive) Regulations 2003/2426, cookies may only be lawfully placed on a device where the user has given his or her consent.

158.    The ICO made clear that, if consent is required under the Privacy and Electronic Communications Regulations, then the data controller cannot rely on the full range of possible lawful grounds provided by Article 6 of the UK GDPR. The ICO AdTech opinion of the ICO dated June 2019 says that consent is the only lawful basis for "business as usual" Real-time Bidding processing of personal data.

159.    Thus, in this case, PubMatic cannot rely on its legitimate interest for its lawful basis of processing under UK GDPR.

160.    Even if it were not precluded as a matter of law, the balance of interests required to be undertaken by PubMatic in order to rely on this basis for lawful processing does not support PubMatic's processing of personal data.

161.    Since PubMatic claims to rely on legitimate interest as a lawful ground, it will still be analyzed herein.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

162.   PubMatic states in its consent policy that it "normally rel[ies] on our (or our Clients) legitimate interests to collect and use your personal information."

163.   Recital 47 of the UK GDPR states that:

> [t]he legitimate interests of a controller, including those of a controller to which the personal data may be disclosed, or of a third party, may provide a legal basis for processing, provided that the interests or the fundamental rights and freedoms of the data subject are not overriding, taking into consideration the reasonable expectations of data subjects based on their relationship with the controller. Such legitimate interest could exist for example where there is a relevant and appropriate relationship between the data subject and the controller in situations such as where the data subject is a client or in the service of the controller. At any rate the existence of a legitimate interest would need careful assessment including whether a data subject can reasonably expect at the time and in the context of the collection of the personal data that processing for that purpose may take place. The interests and fundamental rights of the data subject could in particular override the interest of the data controller where personal data are processed in circumstances where data subjects do not reasonably expect further processing. Given that it is for the legislator to provide by law for the legal basis for public authorities to process personal data, that legal basis should not apply to the processing by public authorities in the performance of their tasks. The processing of personal data strictly necessary for the purposes of preventing fraud also constitutes a legitimate interest of the data controller concerned. The processing of personal data for direct marketing purposes may be regarded as carried out for a legitimate interest.

164.   The ICO, in the same June 2019 AdTech report, found that "reliance on legitimate interests for marketing activities is possible only if organisations [sic] don't need consent under PECR and are also able to show that their use of personal data is proportionate, has a minimal privacy impact, and individuals would not be surprised or likely to object. We believe that the nature of the processing within [Real-time Bidding] makes it impossible to meet the legitimate interests lawful basis

27

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

requirements. This means that legitimate interests cannot be used for the main bid request processing. This is the case even if it were possible for legitimate interests to be applicable elsewhere in the RTB ecosystem...."

165.    A data controller, including PubMatic, cannot claim a legitimate interest where such interests are overridden by the interests or fundamental rights and freedoms of the data subject which require protection of personal data.

166.    Essentially, a business' legitimate interest based upon its own commercial enterprise is self-serving and is not enough to satisfy the legitimate interest required by the UK GDPR. Permitting PubMatic to argue a legitimate interest based solely on a desire to support their business model would render the UK GDPR meaningless.

167.    In order to legally rely on the legitimate interest basis, it is necessary for the data controller to identify a legitimate interest, show that the processing in question is necessary to achieve it, and balance that interest against the individual's interests, rights, and freedoms.

168.    Further, to satisfy the legitimate interest purpose, PubMatic would have to undertake and provide a full assessment of the interests of the parties. Article 35 requires PubMatic to have conducted a Data Protection Impact Assessment. In fact, the ICO made clear in its June 2019 AdTech report that Data Protection Impact Assessments are mandatory for processing through the Real-time Bidding system.

169.    No such assessment was disclosed or provided by PubMatic to Mr. Elliott or Class Members.

170.    Thus, even though PubMatic is precluded by law from relying on its purported legitimate interests, PubMatic's own business interests are clearly overridden by the interests and fundamental rights and freedoms of Mr. Elliott and Class Members, particularly given the scale and intrusiveness of the processing.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

171.   Therefore, PubMatic cannot rely on its purported legitimate interest to satisfy its compliance obligations under the UK GDPR.

172.   PubMatic, as the data controller, is responsible for demonstrating compliance and accountability.

173.   PubMatic is unable to meet this obligation.

174.   PubMatic lacks a lawful basis for its processing of data subjects' personal data, including Mr. Elliott and Class Members.

**PubMatic Lacks Transparency in Its Processing of Personal Data**

175.   Personal data shall be processed lawfully, fairly, and in a transparent manner in relation to the data subject. Article 5(1)(a) ("lawfulness, fairness, and transparency").

176.   By creating and sharing the unique cookie ID and other BGI with other data controllers (who use the personal data for profiling and targeting), PubMatic has processed the personal data of data subjects, including Mr. Elliott and Class Members, without a lawful basis and without meeting the requirement for transparency in such processing.

177.   In addition to transparency being listed as one of the requirements in Article 5(1)(a), separate requirements exist in Articles 13 and 14, which are frequently treated together and place requirements on data controllers to provide certain information to the data subjects.

178.   Specifically, Article 13(1) requires a data controller who collects personal data to provide to the data subjects information, such as:

      a.   The identity and the contact details of the controller and, where applicable, of the controller's representative;

      b.   The contact details of the data protection officer, where applicable;

      c.   The purposes of the processing for which the personal data are intended, as well as the legal basis for the processing;

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

     d.  Where the processing is based on point (f) of Article 6(1), the legitimate interests pursued by the controller or by a third party;

     e.  The recipients or categories of recipients of the personal data, if any; and

     f.  Where applicable the fact that the controller intends to transfer personal data to a third country or international organization, the existence or absence of relevant adequacy regulations under section 17A of the 2018 Act, or reference to the appropriate or suitable safeguards and the means to obtain them.

179.   Article 13(2) further requires disclosure of the following information necessary to ensure fair and transparent processing:

     a.  Period for which personal data will be stored;

     b.  Existence of the right to request access or restrict processing or object to processing;

     c.  The existence of the right to withdraw consent at any time;

     d.  The right to lodge a complaint with the Commissioner;

     e.  Whether the provision of personal data is a statutory or contractual requirement or necessary to enter into a contract; and

     f.  Existence of automated decision making.

180.   Articles 14(1)-(2) have nearly identical disclosure requirements.

181.   In addition to the controller providing the information listed in Articles 13 and 14, the notification should be provided in a concise, transparent, intelligible, and easily accessible form, using clear and plain language.

182.   Pursuant to Recital 58, transparency is particularly important in situations where the proliferation of actors and the technological complexity of practice make it difficult for the data subject to know and understand whether, by whom and

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

for what purpose personal data relating to him or her are being collected, such as in the case here: online advertising.

183.   Recital 39 of the UK GDPR provides, in relevant part, that "any processing of personal data should be lawful and fair. It should be transparent to natural persons that personal data concerning them are collected, used, consulted or otherwise processed and to what extent the personal data are or will be processed. The principle of transparency requires that any information and communication relating to the processing of those personal data be easily accessible and easy to understand, and that clear and plain language be used. That principle concerns, in particular, information to the data subjects on the identity of the controller and the purposes of the processing and further information to ensure fair and transparent processing in respect of the natural persons concerned and their right to obtain confirmation and communication of personal data concerning them which are being processed."

184.   Recital 60 of the UK GDPR provides that, "The principles of fair and transparent processing require that the data subject be informed of the existence of the processing operation and its purposes. The controller should provide the data subject with any further information necessary to ensure fair and transparent processing taking into account the specific circumstances and context in which the personal data are processed. Furthermore, the data subject should be informed of the existence of profiling and the consequences of such profiling. Where the personal data are collected from the data subject, the data subject should also be informed whether he or she is obliged to provide the personal data and of the consequences, where he or she does not provide such data. That information may be provided in combination with standardised [sic] icons in order to give in an easily visible, intelligible and clearly legible manner, a meaningful overview of the intended processing. Where the icons are presented electronically, they should be machine-readable."

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

185.   PubMatic completely fails to satisfy Article 5(1)(a) regarding transparency and Articles 13 and 14 as it does not provide any of the required information to data subjects, including Mr. Elliott and Class Members.

186.   PubMatic violates the transparency principle as data subjects, including Mr. Elliott and Class Members, do not know and seldom can discover what data is held on them, where that data is held, to whom it is transferred, and how it is processed.

187.   In fact, most (if not all Class Members) never have a direct relationship to consent with PubMatic.

188.   PubMatic's failure to name the recipients of the personal data is a further breach of transparency in its processing.

189.   Personal data shall also be collected for specified, explicit and legitimate purposes and not further processed in a manner that is inconsistent with those purposes. Article 5(1)(b) ("purpose limitation").

190.   PubMatic's scope of processing and use of personal data of the data subjects, including Mr. Elliott and Class Members, far exceeds what is specified to the data subjects at the point where the personal data is collected or produced.

191.   Personal data shall be processed in a manner that ensures appropriate security of the personal data, including protection against unauthorized or unlawful processing and against accidental loss, destruction or damage, using appropriate technical or organizational measures. Article 5(1)(f) ("integrity and confidentiality").

192.   PubMatic's actions, including cookie syncing and its sharing of data subjects' personal data without proper monitoring, are done in such a way that PubMatic is prevented from appropriately protecting and ensuring confidentiality and security of the personal data of data subjects, including Mr. Elliott and Class Members.

193.   PubMatic's processing of personal data via the creation of unique cookie IDs and the collection of associated BGI constitutes intrusive, extensive, and unexpected loss of control of personal data.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

194.   As the controller involved in processing, PubMatic is liable for the damage caused by its processing, which infringes the GDPR.

195.   Mr. Elliott and the Class Members have suffered injury from PubMatic's use and transmission of their personal data in the form of loss of control of their personal data.

196.   Once the personal data is shared across AdTech platforms, it cannot realistically be recovered or reverted to private, personal information.

197.   Article 82 of the UK GDPR provides that any person who has suffered material or non-material damage as a result of an infringement of the UK GDPR shall have the right to receive compensation from the controller or processor for the damage suffered.

198.   The UK GDPR specifically references "loss of control over [] personal data" as a type of damage in Recital 85.

199.   Further, according to Sir Geoffrey Vos Chancellor of the High Court in *Lloyd v. Google*, [2019] EWCA Civ. 1599, "Damages are in principle capable of being awarded for loss of control of data under article 23 and section 13, even if there is no pecuniary loss and no distress."[18]

## PLAINTIFF'S FACTS

200.   Mr. Elliott is a citizen of the United Kingdom.

201.   Mr. Elliott is a "data subject" as that term is defined in Article 4(1) of the GDPR.

202.   Mr. Elliott frequently browses websites while he is located within the United Kingdom.

---

[18] This reference is to the predecessor legislation, but the same conclusion applies to Article 82. *See* ¶¶ 64-65 of *Lloyd v. Google*. This case is currently on appeal to the U.K. Supreme Court.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

203.    Some websites that Mr. Elliott visited while in the United Kingdom that interact with PubMatic included Kashflow.com, Goodereader.com, Walesonline.co.uk, Timeout.com,        Thetimes.co.uk,        Thekitchenmccabe.com,        Bonappetit.com, Techradar.com, Muscleandfitness.com, and Tfl.gov.uk.

204.    On January 8, 2021, at 09:25:05, PubMatic placed a cookie with a unique cookie ID and numerous syncing cookies on Mr. Elliott's device as he was browsing websites while located within the United Kingdom.

205.    Specifically, as of the time of filing the Complaint, Mr. Elliott had 45 PubMatic cookies on his Chrome browser, including the uniquely identifying cookie called KADUSERCOOKIE with ID 8885AEF6-AE82-4E20-B2B6-47C1B70A4731, as well as "syncing" cookies.

206.    PubMatic used this unique cookie ID and the syncing cookies placed on Mr. Elliott's device to record Mr. Elliott's visits to websites and his BGI to collect and associate his website browsing behavior while he was within the United Kingdom.

207.    Once PubMatic placed the cookie ID on Mr. Elliott's device, it then tracked Mr. Elliott's visits to websites, including his specific online behavior.

208.    Upon information and belief, PubMatic collected the following information on Mr. Elliott:

   a. Browser and Device information, IP address, and identifiers assigned to his device, such as identifiers stored in a cookie;

   b. Information about his behavior on PubMatic's clients' websites, such as activities or actions on them, session start/stop time on them, and geolocation; and

   c. Information about ads served, viewed, or clicked on, such as the type of ad, where the ad was served, whether he clicked on it, the number of times he has seen the ad, and whether he visited the

34

advertiser's website and/or purchased or installed the product or service advertised.

209.   The BGI collected by PubMatic using the cookie ID is used by PubMatic to track, monitor, and process Mr. Elliott's personal data and is sent into the RTB system such that Mr. Elliott's personal data is used so that targeted advertisements can be targeted at  him.

210.   PubMatic engaged in "cookie syncing" with cookies on Mr. Elliott's device where it exchanged cookie-based information with other companies operating as data controllers as Mr. Elliott browsed from website to website.

211.   Mr. Elliott's cookie ID and the BGI constitute "personal data" within the definitions of that term under Article 4(1) of the GDPR.

212.   At all relevant times, Mr. Elliott was unaware of PubMatic's use and transmission of his personal data.

213.   At the time of the cookie placement, Mr. Elliott had no idea that PubMatic placed cookies on his device, let alone processed and controlled his personal data for use in the RTB system.

214.   Mr. Elliott did not consent to PubMatic's use, monitoring, processing, and transmission of his personal data.

215.   In fact, Mr. Elliott was not informed by PubMatic about how his personal data would be used, when it would be used, or who it would be provided to.

216.   PubMatic did not have a legitimate interest in its use of Mr. Elliott's personal data.

217.   PubMatic had and has no lawful basis for using, processing, and transmitting Mr. Elliott's personal data.

218.   PubMatic was not transparent with Mr. Elliott with regards to his personal data.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

219.   PubMatic's actions included the monitoring of Mr. Elliott's and Class Members' behavior as it took place within the United Kingdom by a data controller located (at PubMatic's own admission) in the United States.

220.   Such use of Mr. Elliott's personal data is a violation of the Data Protection Principles set out in Article 5 of the UK GDPR and the rights provided for in Chapter 3 of the UK GDPR.

221.   By using the cookie ID and associated BGI, PubMatic unlawfully obtained, monitored, and used Mr. Elliott's personal data without his consent.

222.   Mr. Elliott was injured by PubMatic's use, processing, and transmission of his personal data as he suffered a loss of personal data and privacy.

223.   Mr. Elliott continues to be injured by PubMatic's actions because erasure of the personal data will not remedy the infringement since his personal data was disclosed to a number of unidentified third parties, which PubMatic cannot exhaustively identify, without a legal basis.

## JURISDICTION IS MOST APPROPRIATE IN CALIFORNIA

224.   PubMatic's corporate offices and principle place of business is in California.

225.   PubMatic's Privacy Policy states that PubMatic, Inc. is located in the United States and that it certifies compliance with the EU-U.S. Privacy Shield Framework. It further states that it is committed to processing all personal information received in the U.S. from the United Kingdom in reliance on the Privacy Shield Framework.

226.   Thus, it is believed that PubMatic processes personal data from data subjects located within the United Kingdom in the United States.

227.   PubMatic's IPO Prospectus dated December 8, 2020 also supports the processing of Mr. Elliott's personal data within the United States. Specifically, PubMatic states, "Our technology and development personnel, based in Pune, India,

36

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

1  Redwood City, California, and New York, New York, are highly credentialed..." and

2  "We had relied on the EU-U.S. Privacy Shield framework (Privacy Shield framework),

3  to transfer personal data of EU subjects to the United States..."[19]

4      228.    The United Kingdom is not the proper forum. PubMatic never

5  purposefully subjected itself to personal jurisdiction in the United Kingdom.

6      229.    PubMatic has evaded its obligations to register in the United Kingdom,

7  as it has failed to register with the ICO, the UK's independent authority set up to

8  uphold information rights in the public interest and which promotes openness by

9  public bodies and data privacy for individuals, as is a legal requirement under the Data

10  Protection Act 2018.

11      230.    PubMatic does appear to have a minor presence in the United Kingdom

12  under an entity called PubMatic Limited. However, based upon public filings, there is

13  no indication this entity actually performed or performs the actions complained of

14  herein and PubMatic Limited also evaded registration with the ICO, which suggests

15  either it is not a data controller or processor or that PubMatic has failed in its legal

16  obligation to register its UK controller entity with the ICO.

17      231.    Private and public interest factors weigh in favor of California as the

18  proper forum. In terms of private interests, the majority of the evidence in this case,

19  other than the harm, is in California. Convenience of the parties also favors California

20  over the United Kingdom, as PubMatic's business records, executives, engineers, and

21  other relevant witnesses are located in California. In short, evidence of Mr. Elliott and

22  Class Members' harm is in the United Kingdom, but evidence of PubMatic's

23  wrongdoings is in California. California is convenient to PubMatic, as it is

24  headquartered in California. In terms of public interest factors, California has a

25  significant interest because the state must ensure that California companies and those

26

27  [19] The IPO Prospectus predates Brexit such that the comment regarding the EU would have included UK citizens.

28

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

that choose California as a business headquarters are held accountable in the jurisdiction they choose when they perform activities that are unlawful and affect the privacy of others. This Court is best suited to hear this case, not only because this case meets jurisdictional requirements, but because it has been contractually chosen by PubMatic in its contracts with its suppliers and partners.[20] Further, the UK GDPR is quite straightforward and easy to understand, and the nearly identical EU GDPR has been clearly interpreted by both the European Data Protection Board, senior European Courts and English, European Union, and EEA data regulators, such that application of foreign law should not be a burden.

232.   California is the proper venue for this litigation.

## CHOICE OF LAW ANALYSIS FAVORS APPLYING THE SUBSTANTIVE LAW OF THE UK GDPR

233.   Under the EU GDPR Article 82(6), court proceedings for exercising the right to compensation must be brought in one of the EU Member States referred to in Article 79(2). However, following Brexit on January 1, 2021, the DPA 2018 amended this portion of the EU GDPR to remove this jurisdictional requirement, showing a willingness for UK GDPR claims to be brought outside of the UK and the EU.

234.   Commentary of the EU GDPR makes clear that it has extra-territorial scope. For example, in a December 2, 2019 Data Post discussing the Extra-territoriality of the EU GDPR, the European Data Protection Board (the independent body coordinating consistent application of data protection regulation across the EU's

---

[20] See https://pubmatic.com/legal/publisher-master-services-agreement/#Choice
SECTION 11 – CHOICE OF LAW & VENUE. This Agreement shall be construed and interpreted under the laws of the State of California without giving effect to California's principles of conflict of laws, and the parties hereby submit to the exclusive jurisdiction of, and waive any venue objections against the state and federal courts located in Santa Clara County, California and the Borough of Manhattan in New York, New York in any dispute arising under or in connection with this Agreement.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

national regulators) outlines how Article 3 "aims to determine whether a particular processing activity is within the scope of the GDPR and not whether an entity is within the scope of the GDPR (i.e. a non-EU controller can be caught with respect to some data and processing…)"[21] The post goes on to say that "the GDPR seeks (via Article 3) to extend its reach beyond European borders, making non-EU organisations [sic] directly subject to its obligations when processing personal data…"

235.   In sum, the EU GDPR (later adopted by the UK) was developed to protect personal data of data subjects within the EU (which at that time included the UK), regardless of where the conduct occurred or the defendant resides. Thus, the substantive laws of the UK GDPR should be applied.

236.   California substantive law should not be applied, as there is a compelling reason to displace it in favor of the GDPR under the laws of the United Kingdom.

237.   The United Kingdom is the jurisdiction with an interest in having its laws applied to this case, as it has an interest in protecting the data privacy of its citizens, regardless of where the potential defendant is domiciled or its conduct occurs. In fact, the drafters of the UK GDPR anticipated this situation while drafting Article 3, which is intended to apply extra-territorially. Further, the United Kingdom has an interest in having its laws applied to injuries that occur within its borders to its citizens residing within the United Kingdom.

238.   The nature and strength of the United Kingdom's interest in the application of its own law, specifically the UK GDPR, is evident. The UK GDPR was developed specifically to protect its citizens from the exact actions complained of herein against PubMatic. Alternatively, the United Kingdom's interest would be more impaired if its policy were subordinated to the policies of California, such that the laws of the United Kingdom should be applied.

---

[21] The full Data Post can be found at https://hsfnotes.com/data/2019/12/02/edpb-adopts-final-guidelines-on-gdpr-extra-territoriality/.

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

## CLASS ACTION ALLEGATIONS

239.    Plaintiff brings this action individually and as a class action pursuant to Fed. R. Civ. P. 23(a), 23(b)(2), and 23(b)(3) seeking injunctive and monetary relief for PubMatic's systematic failure to comply with the UK GDPR.

**A.    Class Definition**

240.    Plaintiff brings this action on behalf of the following class:

> **Class: All persons residing or who resided in England and Wales who used Chrome, Edge, or Internet Explorer browsers and have had a PubMatic cookie placed on their device during the Relevant Time Period.**

241.    Excluded from the Class are Defendant and its affiliates, parents, subsidiaries, employees, counsel, officers, agents, and directors. Also excluded are any judicial officers presiding over this matter and the members of their immediate families and judicial staff.

242.    The Relevant Time Period is from May 25, 2018 through the present.

243.    Plaintiff reserves the right to amend the Class definition if discovery and further investigation reveal that the Class should be expanded, divided into subclasses under Rule 23(c)(5), or modified in any other way.

244.    Plaintiff is a member of the Class he seeks to represent.

245.    The unlawful personal data use practices described herein have been and are continuing in nature.

**B.    Rule 23(a) and Rule 23(b)(3) Requirements**

**a.    Numerosity**

246.    The proposed Class is so numerous that joinder of all Members is impracticable.

247.    Upon information and belief, the Class size is estimated at approximately 30 million individuals.

40

248.   The Class Members are ascertainable through PubMatic's centralized and electronically-maintained records. Class Members are also able to self-identify by simply checking to see if they have the PubMatic cookie (KADUSERCOOKIE) on their device.

**b.     Commonality**

249.   The prosecution of Plaintiff's claims will require the adjudication of numerous questions of law and fact common to the Class. The common questions of law and fact predominate over any questions affecting only individual Class Members. The common questions include:

a.     Whether PubMatic's Terms & Conditions comply with the UK GDPR;

b.     Whether PubMatic obtained valid consent for the use of Mr. Elliott and the Class Members' personal data;

c.     Whether PubMatic has a legitimate interest for the processing of Mr. Elliott and the Class Members' personal data;

d.     Whether PubMatic processed data lawfully, fairly, and in a transparent manner;

e.     Whether PubMatic has damaged Mr. Elliott and the Class Members through use of their personal data;

f.     Whether the Class is entitled to damages and the amount of damages;

g.     Whether PubMatic should be enjoined from continuing to be out of compliance with the UK GDPR;

h.     Whether the UK GDPR should apply to Mr. Elliott and the Class Members' claims; and

i.     In other ways as shown in discovery.

**c.     Typicality**

250.   Plaintiff has suffered the same violations and similar injuries as other Class Members arising out of and caused by PubMatic's common course of conduct. All

41

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

1   Class Members were subject to the same corporate practices as alleged herein, in

2   particular, by having a unique cookie ID placed on their device which was used to

3   collect BGI, which constituted personal data, and which was unlawfully shared with

4   an unknown number of entities.

5       251.   Mr. Elliott possesses and asserts each of the claims he asserts on behalf

6   of the proposed Class.

7       252.   Mr. Elliott seeks similar relief as other Class Members.

8       **d.   Adequacy of Representation**

9       253.   Mr. Elliott is an adequate class representative.

10      254.   Mr. Elliott's interests are coextensive with those of the Members of the

11  proposed Class. Mr. Elliott is willing and able to represent the proposed Class fairly

12  and vigorously as he pursues his similar individual claims in this action.

13      255.   Mr. Elliott will fairly and adequately protect the interests of the Class

14  because he has no interests antagonistic to, or in conflict with, the Class that Mr.

15  Elliott seeks to represent.

16      256.   Mr. Elliott has retained counsel sufficiently qualified, experienced, and

17  able to conduct this litigation and to meet the time and fiscal demands required to

18  litigate a class action of this size and complexity.

19      **e.   Predominance & Superiority**

20      257.   A class action is superior to other available means for the fair and efficient

21  adjudication of this controversy.

22      258.   A class action is superior to other available methods for the fair and

23  efficient adjudication of the controversy, particularly where individual Class Members

24  lack the financial resources to vigorously prosecute a lawsuit against a large

25  corporation such as PubMatic.

26      259.   Class action treatment will permit a large number of similarly situated

27  persons to prosecute their common claims in a single forum simultaneously, efficiently,

28

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

260.    The prosecution of separate actions by individual Members of the Class would create a risk of inconsistent and/or varying adjudications with respect to the individual Members of the Class, establishing incompatible standards of conduct for PubMatic and resulting in the impairment of Class Members' rights and the disposition of their interests through actions to which they were not parties.

261.    The issues in this class action can be decided by means of common, class-wide proof. In addition, the Court can, and is empowered to, fashion methods to efficiently manage this action as a class action.

262.    PubMatic has acted on grounds generally applicable to Plaintiff and the proposed Class by adopting and following systematic policies, practices, and procedures that unlawfully gather and transmit personal data.

263.    PubMatic has acted or refused to act on grounds generally applicable to Plaintiff and Class Members by failing to obtain proper consent or failure to have a legitimate interest. PubMatic's systematic conduct justifies the requested injunctive and declaratory relief with respect to the Class as a whole.

**f.    Injunctive/Declaratory Relief**

264.    Injunctive, declaratory, and affirmative relief are a predominate form of relief sought in this case. Entitlement to declaratory, injunctive, and affirmative relief flows directly and automatically from proof of PubMatic's refusal to comply with the UK GDPR. In turn, entitlement to declaratory, injunctive, and affirmative relief forms the factual and legal predicate for the monetary and non-monetary remedies for losses caused by PubMatic's systemic unlawful use of personal data.

**C.    <u>Requirements of Rule 23(c)(4) Issue Certification</u>**

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

265.   Additionally, or in the alternative, the Court may grant "partial" or "issue" certification under Rule 23(c)(4). Resolution of common questions of fact and law would materially advance the litigation for all Class Members.

## FIRST CLAIM FOR RELIEF

### Violation of the UK GDPR

266.   Plaintiff re-alleges and incorporates the prior paragraphs of this Complaint as if fully set forth herein.

267.   PubMatic's conduct, as described herein, was and is in violation of the UK GDPR.

268.   Plaintiff and Class Members are "data subjects," as defined in Article 4(1) of the UK GDPR.

269.   Plaintiff and Class Members behavior discussed herein took place within the UK.

270.   PubMatic is a "controller," as defined in Article 4(7) of the UK GDPR.

271.   PubMatic is established outside of the United Kingdom.

272.   Although PubMatic is a data controller not established in the United Kingdom, the data processing activities complained of herein are related to the monitoring of data subjects' behavior within the United Kingdom and, as such, pursuant to Article 3(2)(b), it is subject to the UK GDPR.

273.   PubMatic created and placed unique cookie IDs and used those unique identifiers to collect and monitor Mr. Elliott and Class Members browser generated information (BGI).

274.   The uniquely identifying cookie IDs and associated BGI are "personal data," as defined in Article 4(1) of the UK GDPR.

275.   In processing Mr. Elliott and the Class Members' personal data, PubMatic must act lawfully, fairly, and in a transparent manner.

276.   PubMatic's conduct violates the UK GDPR in at least the following ways:

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

a. PubMatic does not process the personal data of data subjects, including Mr. Elliott and Class Members, lawfully, as it fails to have a legal basis for its processing. PubMatic fails to obtain valid consent and fails to show that it has a legitimate business interest.

b. By creating and sharing the unique cookie ID and other BGI with other data controllers (who use the personal data for profiling and targeting), PubMatic has processed the personal data of data subjects, including Mr. Elliott and Class Members, without a lawful basis and without meeting the requirement for transparency in processing.

c. PubMatic violates the transparency principle as data subjects, including Mr. Elliott and Class Members, do not know and seldom can discover what data is held on them, where that data is held, to whom it is transferred, and how it is processed.

d. PubMatic breaches the principle of transparency because it provides no information to data subjects, including Mr. Elliott and Class Members, regarding what personal data is being processed and because the onward transmission of data, including to whom the data is passed, is not disclosed.

e. PubMatic's failure to name the recipients of the personal data is a breach of transparency in processing.

f. PubMatic's scope of processing and use of personal data of the data subjects, including Mr. Elliott and Class Members, far exceeds what is specified to the data subjects at the point where the personal data is collected or produced.

g. PubMatic's actions, including cookie syncing and its sharing of data subjects' personal data without proper monitoring, are done

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

in such a way that PubMatic is prevented from appropriately protecting and ensuring confidentiality and security of the personal data of data subjects, including Mr. Elliott and Class Members.

h. PubMatic completely fails to satisfy Articles 13-14, as it does not provide any of the required information to data subjects, including Mr. Elliott and Class Members.

i. PubMatic's processing of personal data via the creation of unique cookie IDs and the collection of associated BGI constitutes intrusive, extensive, and unexpected loss of control of personal data.

277.   The conduct herein has caused injury to Mr. Elliott and the Class Members in the form of loss of control of their personal data and invasion of privacy.

278.   As the controller involved in processing personal data, PubMatic is liable for the damage caused by its processing which violates the UK GDPR.

279.   PubMatic's actions alleged herein caused Mr. Elliott and the Class Members to have their personal data shared with unknown sources without adequate consent or a legitimate business interest, thereby causing injury.

280.   Accordingly, Plaintiff and the Class Members have suffered injury in fact, including the loss of personal data and privacy, as a result of PubMatic's lack of a lawful basis for processing and lack of transparency for which compensation should be awarded under Article 82 of the UK GDPR.

281.   Mr. Elliott seeks to enjoin further unlawful acts or practices by PubMatic.

282.   Mr. Elliott requests that this Court enter such orders or judgments as may be necessary to enjoin PubMatic from continuing its unlawful practices and to compensate Mr. Elliott and the Class Members for the injuries each sustained, as

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

provided in Article 82 of the UK GDPR, and for such other relief set forth below, including but not limited to Plaintiff's attorneys' fees.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Elliott and the Class request that the Court enter an order granting the following relief:

1.   That the Court certify the Class pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.   That the Court name Plaintiff as Class Representative and his counsel as Class Counsel;

3.   That Mr. Elliott and the Class have and recover injunctive relief as appropriate;

4.   That Mr. Elliott and the Class have and recover from PubMatic damages for PubMatic's violation of the UK GDPR;

5.   That the Court award attorneys' fees to Plaintiff and any other applicable law;

6.   That the Court award Plaintiff and the Class pre-judgment and post-judgment interest at the highest legal rate provided by law;

7.   That all costs of this action be taxed against PubMatic; and

8.   That the Court award Mr. Elliott and the Class such other and further relief as this Court may deem just and proper.

9.   PLAINTIFF DEMANDS A TRIAL BY JURY.

This the 21st day of May, 2021.

47

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH

BY:   */s/ Alex R. Straus*
Alex R. Straus (SBN 321366)
**WHITFIELD BRYSON LLP**
16748 McCormick Street
Los Angeles, CA 91436
(917) 471-1894 (phone)
(615) 921-6501 (fax)
astraus@whitfieldbryson.com

Daniel Bryson (admitted via *pro hac vice* )
Andrew Hathaway (*pro hac vice forthcoming*)
**WHITFIELD BRYSON LLP**
900 W. Morgan Street
Raleigh, NC 27603
Telephone: (919) 600-5000
Facsimile: (919) 600-5035
dan@whitfieldbryson.com
drew@whitfieldbryson.com

Caroline Ramsey Taylor (admitted via *pro hac vice)*
**WHITFIELD BRYSON LLP**
518 Monroe Street
Nashville, TN 37208
(615) 921-6500 (phone)
(615) 921-6501 (fax)
caroline@whitfieldbryson.com

Greg Coleman (admitted via *pro hac vice*)
William A. Ladnier (CA Bar No. 330334)
**GREG COLEMAN LAW PC**
First Tennessee Plaza
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
T: 865-247-0080
F: 865-522-0049
greg@gregcolemanlaw.com
will@gregcolemanlaw.com
*Counsel for Plaintiff*

48

FIRST AMENDED CLASS ACTION COMPLAINT
Jury Trial Demanded
CASE NO. 4:21-cv-01497-PJH